## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

VANS, INC. and VF OUTDOOR, LLC,

          Plaintiffs,

        v.

MSCHF PRODUCT STUDIO, INC.,

          Defendant.

Case No. 22cv02156

JURY TRIAL DEMANDED

---

## PLAINTIFFS VANS, INC. AND VF OUTDOOR, LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 5

A.    VANS AND ITS INTELLECTUAL PROPERTY RIGHTS ................................................ 5
   1.   Vans' Side Stripe Trademark ...................................................................... 6
   2.   Vans' OLD SKOOL Trade Dress ................................................................ 7
   3.   Vans' Additional Intellectual Property Pertinent to Consumer Confusion. ................... 10
   4.   Vans' Collaboration with Celebrities ........................................................ 12
B.    MSCHF AND ITS UNLAWFUL USE OF VANS' INTELLECTUAL PROPERTY ........................ 12

III.    LEGAL STANDARD ........................................................................................ 13

IV.     ARGUMENT ...................................................................................................... 14

A.    VANS IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADE DRESS AND TRADEMARK
       INFRINGEMENT CLAIMS. .................................................................................... 14
   1.   Vans' Asserted Marks are Valid and Protectable ........................................... 14
   2.   MSCHF's Infringing Shoes Are Likely to Cause Consumer Confusion ......................... 17
        A.   Vans' Marks and Trade Dress Rights Are Strong (Factor One) ......................... 17
        B.   The Infringing Shoes Are Highly Similar to the Asserted Marks (Factor Two) ... 18
        C.   MSCHF Intends to Sell Identical Products to Overlapping Consumers (Factors
             Three and Four) ................................................................................. 21
        D.   Actual Confusion (Factor Five) .............................................................. 22
        E.   MSCHF Has Acted in Bad Faith (Factor Six) .............................................. 23
        F.   MSCHF's Infringing Shoes Are of Unknown Quality and Dangerously Designed
             (Factor Seven) ................................................................................... 23
        G.   Purchasers of Footwear are Unlikely to Exercise Significant Care (Factor Eight)
             .................................................................................................... 24
   3.   MSCHF's Infringing Shoes are Not a Parodic or Artistic Expression ......................... 24
B.    VANS IS LIKELY TO SUCCEED ON THE MERITS OF ITS DILUTION CLAIM. .......................... 25
C.    VANS IS LIKELY TO SUFFER IRREPARABLE HARM .................................................... 27
D.    THE BALANCE OF EQUITIES TIPS DECIDEDLY IN VANS' FAVOR .................................... 28
E.    INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST .................................................... 29
F.    THE BOND SHOULD BE MINIMAL ........................................................................ 29

V.      CONCLUSION .................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bulman v. 2BKCO, Inc.*,
 882 F. Supp. 2d 551 (S.D.N.Y. 2012)......................................................................22

*Cadbury Beverages v. Cott Corp.*,
 73 F.3d 474 (2d Cir. 1996)..................................................................................23

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings*, *Inc.*,
 696 F.3d 206 (2d Cir. 2012)..........................................................................15, 16

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
 598 F.3d 30 (2d Cir. 2010)..................................................................................13

*Doctor's Assocs., Inc. v. Stuart*,
 85 F.3d 975 (2d Cir. 1996)..................................................................................30

*Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*,
 808 F. Supp. 952 (E.D.N.Y. 1992) ...............................................................16, 17

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
 111 F.3d 993 (2d Cir. 1997)..........................................................................20, 21

*Harley Davidson, Inc. v. Grottanelli*,
 164 F.3d 806 (2d Cir.1999)...........................................................................24, 25

*Hormel Foods Corp. v. Jim Henson Productions, Inc.*,
 73 F.3d 497 (2d Cir. 1996)..................................................................................27

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
 176 F. Supp. 3d 137 (E.D.N.Y. 2016) ...............................................................14

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
 930 F. Supp. 2d 489 (S.D.N.Y. 2013)................................................................29

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
 192 F.3d 337 (2d Cir. 1999)................................................................................15

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*,
 965 F.2d 1224 (2d Cir. 1992)..............................................................................13

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
 799 F.2d 867 (2d Cir. 1986)................................................................................22

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
 426 F.3d 532 (2d Cir. 2005)................................................................................13

*Marks Org., Inc. v. Joles*,
    784 F. Supp. 2d 322 (S.D.N.Y. 2011) ................................................................29

*New Kayak Pool Corp. v. R & P Pools, Inc.*,
    246 F.3d 183 (2d Cir. 2001) ...............................................................................17

*NYC Triathlon LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y.2010) ..................................................................27

*Paco Sport, Ltd. v. Paco Rabanne Perfumes*,
    234 F.3d 1262 (2d Cir. 2000) .............................................................................15

*Perry Street Software, Inc. v. Jedi Techs., Inc.*,
    No. 20-cv-04539-CM, 2020 WL 6064168 (S.D.N.Y. Oct. 14, 2020) ...................28

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961) ......................................................................*passim*

*Shandong Shino Food Indus. Co. v. May Flower Int'l, Inc.*,
    521 F. Supp. 3d 222 (E.D.N.Y. 2021) .................................................................15

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
    588 F.3d 97 (2d Cir. 2009) .................................................................................24

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y.2011) ..................................................................27

*Uber Inc. v. Uber Techs., Inc.*,
    521 F. Supp. 3d 455 (S.D.N.Y. 2021) .................................................................26

*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003) ......................................................................*passim*

**Statutes**

15 U.S.C. § 1057 ...................................................................................................15

15 U.S.C. § 1065 ...................................................................................................15

15 U.S.C. § 1116 ...................................................................................................27

15 U.S.C. § 1125 .........................................................................................14, 25, 26

**Other Authorities**

Federal Rule of Civil Procedure 65(c) ....................................................................29

## I.      INTRODUCTION

Plaintiffs Vans, Inc. and VF Outdoor, LLC (collectively, "Vans") bring this motion for a temporary restraining order and a preliminary injunction to prevent the imminent release by Defendant MSCHF Product Studio, Inc. ("MSCHF") of its WAVY BABY shoes (the "Infringing Shoes"), which purposefully imitate the famous and well-recognized OLD SKOOL trade dress while also incorporating numerous other Vans trademarks and indicia of source.  Having already generated significant media attention by collaborating with the rapper Tyga, MSCHF has indicated that it intends to release the shoes to the public on Monday, April 18, 2022, at 12:00 p.m. EST.  Vans therefore respectfully requests that its application for a temporary restraining order be heard, and an order entered, before that date and time, or that an order issue enjoining the release of the Infringing Shoes until the Court can hear arguments on the restraining order.  Given that the release is likely to sell out very quickly, likely long before a preliminary injunction could be granted, immediate relief is the only option that will avoid irreparable harm to Vans.

That MSCHF has purposefully imitated the Vans' branding in its entirety is obvious from a side-by-side comparison of the relevant Vans branding, trademarks and OLD SKOOL trade dress with the Infringing Shoes (*see* Decl. of Tanya L. Greene ("Greene Decl."), Ex. 1):

| Vans' Trademarks/Trade Dress | WAVY BABY Design |
|---|---|
|  |  |

1



Nor does the "wavy" nature of the Infringing Shoes obviate the likelihood of confusion. Vans itself is known for customized versions of its shoes that retain its core OLD SKOOL trade dress. Vans also routinely collaborates with artists on unique or artistic versions of its OLD SKOOL and other iconic shoe lines. Vans itself playfully "skews" its own branding by placing a crooked version of the classic VANS logo on the footbed of its shoes, and both uses and has applied to register the trademark WAYVEE in connection with footwear. Any consumer encountering MSCHF's shoe is therefore likely to believe that MSCHF is collaborating with Vans. Furthermore, Vans' ability to partner with artists to create unique limited editions is likely to be permanently damaged if MSCHF is permitted to usurp this right.

MSCHF's intent in adopting virtually every feature of the OLD SKOOL trade dress and Vans' branding is clearly to capitalize on Vans' fame and goodwill. Since the 1970s, Vans has invested tens of millions of dollars in advertising and promoting its famous shoes lines and trademarks, including its OLD SKOOL shoes, which feature and are sold in connection with a distinctive trade dress (the "OLD SKOOL Trade Dress"), the Vans' "jazz stripe" trademark (the "Side Stripe Mark"), the VANS "Flying-V" Mark ("Flying-V Mark"), the VANS OFF THE WALL Mark and trade dress ("OFF THE WALL Mark"), the waffle sole mark ("Waffle Sole"), the Vans footbed logo ("Footbed Logo"), and the Vans' shoe box trade dress ("Vans Packaging") (collectively, the "Asserted Marks"). Vans' continuous and prominent use and advertisement of the Asserted Marks has generated billions of dollars of revenue from sales of millions of pairs of shoes, including over a billion dollars in revenue each year for the past few years for sales of the OLD SKOOL shoes in the United States, alone. The Asserted Marks, and the OLD SKOOL shoes embodying those marks, have also earned unsolicited recognition for their fame and popularity, becoming one of the most popular and recognizable shoes in the

United States and across the globe. And Vans has built on the fame and notoriety of its brand through key collaborations with celebrities, including the Foo Fighters, Metallica, and A$AP Rocky, to release limited-edition designs of its famous shoes.

Despite Vans' well-established rights in its famous OLD SKOOL Trade Dress and the Side Stripe Mark, MSCHF has announced its intent to release the Infringing Shoes, which intentionally copy the OLD SKOOL Trade Dress and merely alter the Dress to give the shoe a warped, or "wavy," appearance. Indeed, as shown above, a visual comparison of the Infringing Shoes and the OLD SKOOL Trade Dress demonstrates that there is no significant difference between the shoes other than the wavy appearance. But MSCHF did not stop there, copying not only the OLD SKOOL Trade Dress, but also the Waffle Sole, Footbed Logo, and Vans Packaging. There is therefore no doubt that the Infringing Shoes are intended to indicate to consumers that the Infringing Shoes are manufactured, sponsored, or otherwise endorsed by Vans, when they are not, creating a significant likelihood of consumer confusion and diluting the value of Vans' famous OLD SKOOL Trade Dress and Side Stripe Mark.

Vans will be irreparably harmed if MSCHF is not enjoined from releasing the Infringing Shoes during the pendency of this litigation. Not only will the Infringing Shoes cause consumer confusion, their release will also deprive Vans of its right to control the quality and distinctiveness of its shoes and the manner and timing of their release, causing irreparable harm to Vans' name and brand. By contrast, because it has not yet released its Infringing Shoes, MSCHF will suffer little, if any, harm from a preliminary injunction. Considering the likelihood that Vans will succeed on the merits of its claims, the harm to Vans' if no injunction is granted, and the balance of equities and public interest—as set forth more fully below—the Court should enjoin further unlawful conduct by MSCHF and grant Vans' requested relief.

4

## II.    FACTUAL BACKGROUND

### A.    Vans and Its Intellectual Property Rights

Founded in 1966, Vans is an industry-leading shoe and apparel company, which is known for its original, authentic, and distinctive footwear and apparel that embody Southern California counterculture.  *See* Decl. of Kia Wimmer ("Wimmer Decl.") ¶ 5.  Since the 1970s and 1980s, Vans has been developing, promoting, and selling some of its most iconic shoe lines, including its OLD SKOOL shoes.  Decl. of Rian Pozzebon ("Pozzebon Decl.") ¶¶ 6, 10, 12, 15.

Vans has continuously promoted and sold its OLD SKOOL shoes for over four decades. *Id.* ¶ 12.  Vans distributes its iconic footwear through a carefully selected, global network of distribution channels, including major department stores and retailers; sporting goods and outdoor retailers; Vans' own 450+ retail stores throughout the United States; and via online sales on Vans' own website (www.vans.com).  Decl. of Daniel Callahan ("Callahan Decl.") ¶ 11.

Vans' shoes, including the OLD SKOOL shoes, are now some of the most popular footwear in the United States.  For each of the past several years, an independent third-party survey called "Taking Stock with Teens" has consistently found that Vans is the No. 2 overall favorite footwear brand among U.S. teens.  According to the survey, Vans trails only Nike in popularity among teens.  *Id.* ¶ 9, Ex. 1.  This popularity has also been reflected in Vans' sales. For each of the past few years, Vans' annual sales in the U.S. have surpassed $1 billion for the OLD SKOOL shoes, alone.  *Id.* ¶ 7.

Vans' success has been driven by factors such as its focus on just a few iconic shoe lines, its reputation for creating lasting and durable footwear without sacrificing style, and its longstanding and consistent use of its trademark and trade dress rights, including its rights with

respect to the Asserted Marks and its other relevant intellectual property, as detailed below.
Wimmer Decl. ¶ 7-27; Callahan Decl. ¶ 15.

> **1.** *Vans' Side Stripe Trademark*

In the 1970s, Vans began using its now-iconic "jazz stripe," which adorns the side panel

of its OLD SKOOL shoes, as well as many other shoes sold by Vans (the "Side Stripe Mark").

*See* Pozzebon Decl. ¶ 5-6.  Since then, Vans has continuously manufactured, promoted, and sold

footwear using the Side Stripe Mark.  *Id.*  As displayed on the OLD SKOOL Trade Dress, Vans

owns all right, title, and interest in the following Side Stripe Marks:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 2,177,772 | August 4, 1998 | *Class 25*: Footwear |
|  | 4,442,122 | December 3, 2013 | *Class 25*: Clothing |

Wimmer Decl. ¶ 8.  Vans also owns all right, title, and interest in the following Side Stripe

Marks for other shoe lines:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 2,170,961 | July 7, 1998 | *Class 25*: Footwear |
|  | 2,172,482 | July 14, 1998 | *Class 25*: Footwear |

*Id.*  Pursuant to Sections 8 and 15 of the Lanham Act, each of these registrations is incontestable.

*Id.* ¶¶ 9-10; Exs. 1-4.

Since placing the Side Stripe Mark on shoes, including the OLD SKOOL, Vans has sold hundreds of millions of shoes bearing the Side Stripe Mark in the U.S. alone.  Callahan Decl. ¶ 7. In is lifetime, Vans has generated well over $10 billion in revenue based solely on U.S. sales of footwear with the Side Stripe Mark.  *See id.*  Moreover, for each of the past few years, Vans generated over $1 billion per year based on U.S. sales of such shoes.  *Id.*

Over the years, Vans has spent tens of millions promoting the Side Stripe Mark. Declaration of Justin Regan ("Regan Decl.") ¶ 14.  Vans advertises and promotes footwear bearing the Side Stripe Mark through a wide variety of traditional and non-traditional means, including print, television, and internet advertising, event sponsorship, and athlete endorsement, to name a few.  *Id.* ¶¶ 13-18.  Vans has also collaborated with celebrities to develop and sell limited-edition releases of shoes featuring the Side Stripe Mark, including collaborations with artists such as Tyler, the Creator, Public Enemy, and Metallica.  *Id.* ¶ 24.  As a result of Vans' efforts, the public recognizes and understands that the Side Stripe Mark distinguishes and uniquely identifies Vans' products, including the OLD SKOOL shoes, as evidenced by the significant unsolicited news coverage referring to the "famous" and "iconic" nature of the mark. *Id.* ¶ 18; Ex. 1.

### 2.    *Vans' OLD SKOOL Trade Dress*

In 1977, Vans introduced its iconic low-top skate shoe known as the "OLD SKOOL." Pozzebon Decl. ¶ 5.  Debuting under the name "Style 36," the OLD SKOOL was one of the first Vans shoes to feature the Side Stripe Mark.  *Id.*

Vans owns the OLD SKOOL Trade Dress, which comprises a distinctive combination of source-identifying elements, including: (1) the Vans Side Stripe Mark on the shoe upper; (2) a rubberized sidewall with a consistent height around the perimeter of the shoe; (3) the uppermost

portion of the sidewall having a three-tiered or grooved appearance; (4) a textured toe box outer around the front of the sidewall; (5) visible stitching, including where the eyestay meets the vamp; and (6) the placement and proportion of these elements in relation to one another. Wimmer Decl. ¶ 12; Pozzebon Decl. ¶ 7.



*Vans OLD SKOOL*

Since first launching the OLD SKOOL, Vans has continuously manufactured, promoted, and sold shoes bearing the OLD SKOOL Trade Dress.  Pozzebon Decl. ¶ 6.  Vans has manufactured, promoted, and sold well over 1,000 colorways (including numerous high-profile collaborations) within the OLD SKOOL shoe line.  *Id.* ¶ 12.

Due to Vans' significant investments and efforts, Vans has sold over 200 million pairs of OLD SKOOL shoes in the U.S.  Callahan Decl. ¶ 7.  In its lifetime, Vans has generated over $10 billion in revenue based solely on U.S. sales of OLD SKOOL shoes.  *Id.*  Moreover, for each of the past few years, Vans generated over $1 billion per year based on U.S. sales of such shoes.  *Id.* Vans has also spent tens of millions of dollars promoting its OLD SKOOL Trade Dress.  Regan Decl. ¶ 20.  And Vans advertises and promotes footwear bearing the OLD SKOOL Trade Dress through a wide variety of traditional and non-traditional means, as outlined in the Declaration of Justin Regan.  *Id.* ¶¶ 20-26; Exs. 2-7.

Over the 40 years since the introduction of the OLD SKOOL shoe, the OLD SKOOL Trade Dress remains immensely popular and continues to grow in popularity.  Vans shoes bearing the OLD SKOOL Trade Dress are routinely worn and popularized by athletes, pop stars, rappers, artists, and other influential celebrities, including Frank Ocean, Justin Bieber, Kanye, A$AP Rocky, Tyler, the Creator, Russell Westbrook, Julia Roberts, Paul Walker, Gwen Stefani, Miguel, Olivia Wilde, Kylie Jenner, and Kristen Stewart.  Regan Decl. ¶ 24.

Similarly, third-party news organizations comment on the popularity and distinctiveness of the OLD SKOOL Trade Dress.  By way of example, a 2018 article in *W Magazine* named the OLD SKOOL as the "most popular shoe of the summer," and *Business Insider* observed that the OLD SKOOL was "blowing up the fashion world" and had "surpassed its humble roots to become an icon in its own right."  *Id.* ¶¶ 22; Exs. 4-5.

The OLD SKOOL shoe is one of the most sought-after sneakers in the world.  In 2017, online fashion website *Lyst* found the OLD SKOOL shoe was the No. 4 most searched sneaker in the world.  *Id.* ¶ 23; Ex. 6.  And according to a 2019 research study by SEMrush, Vans' OLD SKOOL was the No. 3 most popular sneaker search on Google in the U.S. within the previous 12 months.  *Id.* ¶ 23; Ex. 7.

As a result of Vans' extensive use and promotion of the OLD SKOOL Trade Dress, Vans built up and now owns tremendous and valuable goodwill symbolized by the trade dress. Wimmer Decl. ¶ 13; Pozzebon Decl. ¶ 13.  Vans' OLD SKOOL Trade Dress is distinctive and non-functional, and it has achieved significant secondary meaning.  Pozzebon Decl. ¶ 13. Indeed, multiple consumer surveys, including a survey conducted by Vans, have demonstrated that the OLD SKOOL Trade Dress has secondary meaning as a source identifier for Vans. Wimmer Decl. ¶ 14; Ex. 5.

### 3.      *Vans' Additional Intellectual Property Pertinent to Consumer Confusion.*

In addition to the Side Stripe Mark and OLD SKOOL Trade Dress, since 1977, Vans has used and owns all rights in the following trademarks that are featured on the OLD SKOOL shoe (the "OFF THE WALL Mark"):

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
|  | 6,309,462 | March 30, 2021 | *Class 25*: Footwear |
|  | 6,309,463 | March 30, 2021 | *Class 25*: Footwear |

Wimmer Decl. ¶ 15.

Since the 1970s, Vans has continuously manufactured, promoted, and sold shoes featuring the OFF THE WALL Mark, including the OLD SKOOL shoe.  Pozzebon Decl. ¶¶ 6, 15.  In that period, Vans has sold millions of shoes bearing the OFF THE WALL Mark in the U.S. alone.  Callahan Decl. ¶ 7.  Vans has generated well over $10 billion in revenue on sales of footwear featuring the OFF THE WALL Mark, including over $1 billion in U.S. sales revenue for such shoes each year for the past few years.  *Id.* ¶¶ 7-8.  Vans has also spent millions promoting the OFF THE WALL Mark through traditional and non-traditional means.  Regan Decl. ¶¶ 27-28.  As a result of Vans' efforts, the public recognizes and understands that the OFF THE WALL Mark distinguishes and uniquely identifies Vans' products.  *Id.*

In addition to the OFF THE WALL Mark, Vans has also continuously used and registered the following representative examples of its other Asserted Marks:

| Trademark | U.S. Reg. No. | Reg. Date | Relevant Goods/Services |
|---|---|---|---|
| **VANS** *Flying V Mark* | 6,136,351 | August 25, 2020 | *Class 25*: Footwear |
| *Waffle Sole* | 1,244,537 | July 5, 1983 | *Class 25*: Footwear |

MSCHF has also intentionally copied the trade dress of Vans' shoe boxes, as well as the

VANS logo placed in the footbed of its shoes (the Footbed Logo), as shown in the below

comparison (Greene Decl., Ex. 1):

| **Vans Trade Dress** | **Wavy Baby Design** |
|---|---|
|  |  |
|  |  |

Finally, since August 2021, Vans has used the mark WAYVEE in connection with

footwear, which Vans has applied to register under U.S. Serial No. 97/040,210.  Wimmer Decl. ¶

16.  The WAYVEE Mark is a creative reference to both Vans' famous "Flying Vee" design and

its wavy Side Stripe Mark.  *Id.* ¶ 17.  Vans' rights in the WAYVEE Mark are senior to any rights

MSCHF has in the WAVY BABY name.  *Id.* ¶ 18.

> ### 4. *Vans' Collaboration with Celebrities*

As part of its business strategy, Vans has collaborated with a curated list of celebrities to

advertise, design, and sell its shoe lines, including Anderson Paak, Metallica, A$AP Rocky,

Tierra Whack, and the Foo Fighters.  Regan Decl. ¶ 24, 29.   These partnerships include

collaborations on limited-edition releases of Vans' famous shoes, such as the OLD SKOOL.  *Id.*

¶ 29.  Vans' collaboration strategy is particularly focused on the music industry, in recognition of

music's importance to Vans' brand and customer base.  *Id.*  In total, Vans invests millions of

dollars a year in collaborations with celebrities and music industry advertising.  *Id.*

> ### B.   MSCHF and Its Unlawful Use of Vans' Intellectual Property

Unlike Vans, MSCHF has built its business model on avoiding the significant

investments required to develop original, authentic, and high-quality products of its own design,

choosing instead to adopt, with few changes, the famous designs of its competitors' shoes.  Its

intended release of the Infringing Shoes is no exception.

In March 2022, Vans discovered that Michael Ray Nguyen-Stevenson, a recording artist

who goes by the stage name Tyga, had posted images of his latest music video in which he wore

shoes that resembled Vans' OLD SKOOL shoe.  Wimmer Decl. ¶ 19.  On or about April 6, 2022,

Vans discovered that the shoes were a collaboration between Mr. Stevenson and MSCHF called

the WAVY BABY, and that MSCHF intended to release the shoes on its website and mobile

application on April 18, 2022.  *Id.* ¶ 20.  Upon learning of MSCHF's imminent release of the

Infringing Shoes, Vans demanded that Mr. Stevenson, MSCHF, and their affiliates immediately

cancel the planned launch of the Infringing Shoes and permanently refrain from marketing the WAVY BABY design. *Id.* ¶ 21.

Despite Vans' efforts to prevent MSCHF's infringing conduct or otherwise resolve the parties' dispute, MSCHF has refused to cancel its planned release of the Infringing Shoes, threatening to release into the market potentially thousands of pairs of shoes that are confusingly similar to, and dilutive of, Vans' OLD SKOOL Trade Dress and the Side Stripe Mark. *Id.* ¶ 22.

## III.   LEGAL STANDARD

"To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor.'" *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).  The "standards which govern consideration of an application for a temporary restraining order… are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).  A court can also grant preliminary relief "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claim, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  As detailed below, Vans has met the standard for a preliminary injunction, and thus, a temporary restraining order should also issue against MSCHF.

## IV.    ARGUMENT

### A.    Vans Is Likely to Succeed on the Merits of Its Trade Dress and Trademark Infringement Claims.

To prevail on its trademark infringement claims, Vans must show: (1) it owns a valid, protectable mark; (2) that the defendant used the mark in commerce without consent; and (3) that there is a likelihood of consumer confusion.  *See* 15 U.S.C.A. § 1114(1)(a)-(b).  Vans' other trademark-related claims for false designation of origin/unfair competition under the Lanham Act (Counts I and II) and common law trademark infringement and unfair competition (Count VI) require essentially the same showing.  *See, e.g.*, 15 U.S.C. § 1125(a); 15 U.S.C. § 1125(c); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 157-158 (E.D.N.Y. 2016).  Once a mark is found to be protectable, establishing a likelihood of confusion "is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits," that justifies preliminary relief.  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).  Here, there is no dispute that MSCHF has, without authorization, used the OLD SKOOL Trade Dress and Side Stripe Mark, as well as the other Asserted Marks, in commerce by advertising the Infringing Shoes for sale in the United States.  Wimmer Decl. ¶ 23.  Accordingly, the likelihood that Vans will succeed on the merits turns on the first and last elements.

### 1.    Vans' Asserted Marks are Valid and Protectable[1]

The evidence clearly establishes that Vans has valid and protectable rights in the Side Stripe Mark and OLD SKOOL Trade Dress.  For one, Vans' trademark registrations for the Side Stripe Mark are *prima facie* evidence of the validity, ownership, and exclusive right by Vans to use the Mark.  15 U.S.C. § 1057(b); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192

---

[1] Although Vans has valid and protectable rights in all of its Asserted Marks, due to space constraints, Vans has focused on its OLD SKOOL Trade Dress and the Side Stripe Mark.  Vans can provide evidence of its rights in the other Asserted Marks at the Court's request.

F.3d 337, 345 (2d Cir. 1999) (holding that a certificate of registration establishes that a mark is "valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce"). The registrations for the Side Stripe Mark have also become incontestable, and "are conclusively presumed to be valid and entitled to protection." *Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000); 15 U.S.C. § 1065; Wimmer Decl. ¶¶ 9-10; Exs. 1-4.

Additionally, Vans has valid and protectable rights in the OLD SKOOL Trade Dress. "'A product's trade dress is protected under the Lanham Act if it is not functional and if it is either inherently distinctive or has acquired secondary meaning in the marketplace.'" *Shandong Shino Food Indus. Co. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 253 (E.D.N.Y. 2021) (quoting *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001)).

Here, Vans has ample evidence that its OLD SKOOL Trade Dress has at least acquired secondary meaning. Factors indicating secondary meaning include: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 226 (2d Cir. 2012). Each of these factors is satisfied here.

Indeed, Vans began selling its OLD SKOOL Trade Dress in the 1970s, and it has sold over 200 million pairs of the shoes in the years since, establishing both length of use and sales success. Callahan Decl. ¶¶ 5-7. Vans has also earned several billion dollars in revenue based on its U.S. sales of the OLD SKOOL shoe, alone, and has invested millions in advertising the OLD SKOOL Trade Dress through traditional and non-traditional means. Regan Decl. ¶ 20; Callahan

Decl. ¶ 7.  And third-party sources have given the OLD SKOOL Trade Dress significant

unsolicited praise and attention.   Regan Decl. ¶¶ 22-23; Exs. 3-7.

Further, MSCHF's intentional copying of the OLD SKOOL Trade Dress is itself

"persuasive evidence of secondary meaning."  *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F.

Supp. 952, 958 (E.D.N.Y. 1992).  Consumers surveys have also found the OLD SKOOL Trade

Dress to be distinctive, which are "particularly useful in establishing secondary meaning."  *Essie*

*Cosmetics*, 808 F. Supp. at 958; Wimmer Decl. ¶ 14; Ex. 5.

Finally, the OLD SKOOL Trade Dress elements are nonfunctional, as none of the

elements are "'essential the purpose of the article,'" in that they are not "dictated by the

functions to be performed by [shoes]"—*i.e.*, the support and protection of a foot—nor do the

features of the OLD SKOOL Trade Dress "'affect[] the quality or cost of the article,'" because

they do not "permit[] the [shoe] to be manufactured at a lower cost or . . . improve[] the

operation of the [shoe]."  *Christian Louboutin S.A.*, 696 F.3d at 219-20 (quoting in part *Innwood*

*Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)).  And the OLD SKOOL Trade

Dress is not aesthetically functional, as giving Vans exclusive right to use the Dress does not

"*significantly* limit the range of competitive designs available" to competitors and therefore does

not "put competitors at a significant non-reputation-related disadvantage."  *Id.* (emphasis

supplied).

Considering the above factors and evidence, MSCHF cannot genuinely dispute that Vans

has valid and protectable rights in at least the OLD SKOOL Trade Dress and Side Stripe Mark,

and Vans can establish its indisputable rights in the remaining Asserted Marks, as well.

### 2.      *MSCHF's Infringing Shoes Are Likely to Cause Consumer Confusion*

Vans is also likely to succeed in establishing a likelihood of confusion—and thus irreparable harm—from MSCHF's promotion and sales of its Infringing Shoes.  To determine likelihood of confusion, courts in the Second Circuit apply the eight-factor test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), which considers: (1) the strength of the senior user's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) the junior user's good faith in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of buyers.  *Id.* at 495.  The same factors are also used to determine trade dress infringement.  *See Essie Cosmetics*, 808 F. Supp. at 959. "[A]pplication of the Polaroid test need not be rigid," and although "no single factor is determinative," "the first three factors are perhaps the most significant."  *New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir. 2001).

### a.      Vans' Marks and Trade Dress Rights Are Strong (Factor One)

"The strength of a trademark encompasses two different concepts, both of which relate significantly to likelihood of consumer confusion."  *Virgin Enters.*, 335 F.3d at 147.  The first is the inherent distinctiveness of the mark, which considers whether the mark is arbitrary and fanciful or merely generic, descriptive, or suggestive of the goods with which it is sold.  *Id.*  The second concept—acquired distinctiveness—refers to the fame the mark has obtained from its prominent use in commerce and consumer recognition.  *Id.*  Marks that have inherent and/or acquired distinctiveness are entitled to "broad, muscular protection."  *Id.*

The OLD SKOOL Trade Dress and Side Stripe Mark are both inherently and commercially strong.  The Asserted Marks have no intrinsic relationship to shoes and are

therefore arbitrary and fanciful with respect to the goods with which they are sold.  *Id.* at 148.

The Asserted Marks have also acquired distinctiveness and fame through Vans' investment of

tens of millions of dollars in advertising and promoting the Asserted Marks; Vans' significant

sales of products bearing the asserted rights; and the numerous, unsolicited media references and

coverage of the Dress and Mark.  *See* Regan Decl. ¶¶ 18, 22-23; Exs. 2-7; Callahan Decl. ¶ 7.

Vans' OLD SKOOL shoes have also been recognized as among the most well-known and

popular sneakers in the world.  Regan Decl. ¶¶ 22-23; Exs. 3-7.  And consumer surveys have

shown that the OLD SKOOL Trade Dress serves as a unique identifier for Vans.  Wimmer Decl.

¶ 14; Ex. 5.  For at least these reasons, Vans' trademarks and trade dress rights are strong.

   b. <u>The Infringing Shoes Are Highly Similar to the Asserted Marks (Factor Two)</u>

  The second *Polaroid* factor—the degree of similarity between the marks at issue—also

weighs strongly in Vans' favor.  Indeed, a visual comparison of the Infringing Shoes to Vans'

OLD SKOOL Trade Dress and other Asserted Marks establishes the high degree of similarity

between MSCHF's shoes and Vans' famous dress and associated marks.

| Vans' Trademarks/Trade Dress | WAVY BABY Design |
|---|---|
|  |  |



As the above images show, the WAVY BABY shoe design is undeniably evocative of Vans' Side Stripe Mark and OLD SKOOL Trade Dress. First, the side stripe on MSCHF's Infringing Shoes is placed on the silhouette of the shoes in the same manner as Vans' placement—emanating from the heel counter and terminating at the eye stay reinforcements. A comparison between Vans' U.S. Trademark Registration No. 2,177,772 and MSCHF's Wavy Baby shoe demonstrates MSCHF's use of a confusingly similar stripe:



U.S. Reg. No. 2,177,772                    Infringing Wavy Baby Shoe

The Infringing Shoes also feature a rubberized sidewall that, apart from the "wavy" construction, maintains a consistent perimeter around the shoe; a three-tiered appearance on the uppermost portion of the sidewall; a textured toe box outer around the front of the sidewall; and visible stitching, including where the eyestay meets the vamp, all of which are distinctive features of the OLD SKOOL Trade Dress. Wimmer Decl. ¶ 12; Pozzebon Decl. ¶¶ 7-8.

The similarity of the Infringing Shoes to Vans' OLD SKOOL Trade Dress is also compounded by the additional Vans-identifying branding that MSCHF uses in connection with the Infringing Shoes. Indeed, the similarity of two products requires consideration on "the overall appearance of the packaged products," including the placement of fixtures on the product and the colors used. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1003 (2d Cir. 1997). Here, MSCHF mutilates several Vans' marks and trade dress elements to create an even closer connection between the Infringing Shoes and Vans in the mind of consumers. For example, MSCHF applied a red badge on the rear heel of the shoe with an image of a ghost in

20

white, which is meant to resemble the OFF THE WALL Marks used on the rear heel of Vans'
OLD SKOOL shoes. *See supra*, Section II.A.3. The red badge logo also features a stylized
version of the word WAVY, which intentionally mimics Vans' Stylized VANS Mark. *See id.*
And even the chosen name for the shoes, WAVY BABY, resembles Vans' WAYVEE Mark.
*See id.* As shown above, the Infringing Shoes also intentionally mimic and use the Waffle Sole,
Footbed Logo, and even the Vans Packaging. As these non-limiting examples demonstrate, the
Infringing Shoes are packaged and advertised in a manner that is almost identical to the OLD
SKOOL Trade Dress and that intentionally copies Vans' other well-known marks, in an obvious
attempt to capitalize on the tremendous goodwill that Vans has built in the Asserted Marks over
many decades. The similarities between the Infringing Shoes and the Asserted Marks therefore
strongly favors Vans.

c.   MSCHF Intends to Sell Identical Products to Overlapping Consumers
(Factors Three and Four)

The proximity of the senior and junior users' products in the marketplace "has an obvious
bearing on the likelihood of confusion." *Virgin Enters.*, 335 F.3d at 149-50. "[T]he closer the
secondary user's goods are to those the consumer has seen marketed under the prior user's brand,
the more likely that the consumer will mistakenly assume a common source." *Id.* at 150. Here,
the goods sold by Vans and MSCHF are both sneakers and thus could not be more related. *See
Fun-Damental Too, Ltd.*, 111 F.3d at 1003 (finding that products that were "nearly identical"
supported "the finding of likelihood of confusion"). MSCHF also intends to sell the Infringing
Shoes through the same marketing channels as Vans—namely, digital platforms—to overlapping
consumers. Regan Decl. ¶¶ 9-10; Callahan Decl. ¶ 11. And, like MSCHF, Vans has
collaborated with celebrities on its own limited-edition releases of shoe designs, as well as to

21

advertise its productions, with a particular focus on the music industry—the same industry in which MSCHF's collaborator, Mr. Stevenson, is well known. *See supra*, Section II.A.4.

The products at issue therefore exist in the same market and target overlapping consumers who are likely to falsely believe that the Infringing Shoes are another Vans celebrity collaboration. Accordingly, the third *Polaroid* factor favors Vans. Moreover, because the products will operate in the same market, the fourth *Polaroid* factor—whether the senior user is likely to "bridge the gap" into the junior user's market—is not relevant. *See Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 562 (S.D.N.Y. 2012).

> d.   Actual Confusion (Factor Five)

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986). Nonetheless, even before the planned release of the Infringing Shoes, multiple independent sources have noted the obvious similarity between the Infringing Shoes and Vans' OLD SKOOL Trade Dress, and have even directly confused Vans and MSCHF as the source of the goods. *See, e.g.*, Rosendahl Decl. ¶ 4; Ex. 1. As just one example, the online magazine *Input* wrote an article titled "MSCHF and Tyga's 'Wavy Baby' Sneakers Seriously Distort Classic Vans," in which it stated that the "'Wavy Baby' . . . features a black upper, a much curvier version of Vans' signature Jazz Stripe, white midsole, and a gum waffle outsole," noting also that it was "impossible to ignore the sneakers' heavy resemblance to Vans' classic Old Skool silhouette." *Id.*, Ex. 1. Another source referred to the Infringing Shoes as "The MSCHF x Vans Baby Wave." *Id.* MSCHF's extensive promotion is already causing confusion,

which is likely to compound if the Infringing Shoes are released.  The fifth *Polaroid* factor therefore favors Vans.

          e.      <u>MSCHF Has Acted in Bad Faith (Factor Six)</u>

There is no question in this case that MSCHF intentionally adopted the same features as the OLD SKOOL Trade Dress to capitalize on Vans' reputation and goodwill and to cause confusion between its shoes and Vans' products.  As multiple third-party sources have recognized, the Infringing Shoes are an intentional mutilation of the Asserted Marks.  Rosendahl Decl. ¶ 4, Ex. 1.  MSCHF's intentional copying of multiple Vans' trademark and trade dress rights in connection with the Infringing Shoes only confirms that it acted in bad faith to profit from Vans' famous shoe designs.  The sixth *Polaroid* factor therefore favors Vans.

          f.      <u>MSCHF's Infringing Shoes Are of Unknown Quality and Dangerously Designed (Factor Seven)</u>

The seventh *Polaroid* factor requires the Court "consider[ ] whether the senior user's reputation could be 'tarnished by [the] inferior merchandise of the junior user.'"  *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) (quoting *Scarves by Vera, Inc. v. Todo Imps. Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976)).  Because the Infringing Shoes have yet to be released, their quality is unknown.  However, MSCHF has made obvious alterations to the OLD SKOOL Trade Dress that pose a safety risk to consumers, as the wavy construction of the out- and midsole of the shoes is less stable than the standard flat-sole shoe design found in Vans' OLD SKOOL shoes, and therefore less likely to support the wearer.  Callahan Decl. ¶ 16.  The potential instability of the Infringing Shoes, and risk of resulting injury to consumers, threatens to tarnish Vans' reputation as a source of high-quality, dependable footwear.  The seventh *Polaroid* factor therefore favors Vans.

23

g.      Purchasers of Footwear are Unlikely to Exercise Significant Care (Factor Eight)

The final factor considers the degree of care that typical consumers of the parties' products would be expected to exercise in purchasing those products. *Virgin Enters.*, 335 F.3d at 151. Along the spectrum of possible purchasers, "[r]etail customers . . . are not expected to exercise the same degree of care as professional buyers, who are expected to have greater powers of discrimination." *Id.* (internal quotations and citations omitted). Here, the purchasers of Vans' and MSCHF's products are retail customers, who most often purchase shoes through self-service mediums such as a website, without any guidance from a professional. Wimmer Decl. ¶¶ 25-26. Moreover, shoes are a common consumer item, purchasers of which are unlikely to exercise a high degree of care. The eighth, and final, *Polaroid* factor therefore favors Vans.

### 3.      MSCHF's Infringing Shoes are Not a Parodic or Artistic Expression

Acknowledging that its Infringing Shoes are clearly knockoffs of Vans' OLD SKOOL Trade Dress, MSCHF has instead fallen back on the argument that its shoes, which it intends to sell to the general public for its own profit, are merely a parody or artistic take on Vans' Asserted Marks. However, the Second Circuit has recognized that parodic use or artistic alteration of a mark is "sharply limited" in circumstances where, as here, "an alleged parody of a competitor's mark [is used] to sell a competing product." *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 (2d Cir.1999). Moreover, parody marks also cannot themselves be used to indicate the source or sponsorship of a good. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 111-13 (2d Cir. 2009).

Here, MSCHF has not released the Infringing Shoes as an obvious commentary on Vans, the OLD SKOOL shoe, or some other societal issue, as is typical in a parody case. Instead, it has merely adopted the well-known and famous Asserted Marks and slightly altered their appearance

24

to sell potentially thousands of shoes that directly compete with, and dilute the distinctiveness of, Vans' own products. But giving the Asserted Marks a "wavy" appearance as a fast gimmick to sell shoes is not a fair or artistic use of Vans' intellectual property rights. *See Harley Davidson, Inc.*, 164 F.3d at 813 (finding that claimed parodic use of Harley Davidson logo was not fair use when the logo made no obvious comment on Harley Davidson or its logo and was simply used in a humorous manner to promote the defendant's own products). This is particularly true when Vans itself is known for customized versions of its shoes that retain its core OLD SKOOL Trade Dress, as the Infringing Shoes do here, and also for playful "skews" of its own branding, such as placing a crooked version of the classic VANS logo on the footbed of its shoes. Regan Decl. ¶ 30. Simply put, MSCHF cannot slightly alter a famous trade dress in which Vans has invested significant resources to sell a competing product and claim that it is merely artistic or parodic expression. MSCHF's only defense is therefore unlikely to prevail on the merits.

Ultimately, because Vans is very likely to establish that it has valid and protectable rights in the OLD SKOOL Trade Dress and Side Stripe Mark and that MSCHF has infringed those rights, Vans respectfully requests that the Court temporarily and preliminary enjoin MSCHF from selling the Infringing Shoes until an adjudication on the merits.

**B.      Vans Is Likely to Succeed on the Merits of Its Dilution Claim.**

Even if the Court finds that Vans is not entitled to preliminary relief on its trademark infringement claims, Vans is nonetheless separately entitled to preliminary relief on its federal and state trademark dilution claims (Counts III and V). To prevail on its federal dilution claim, Vans must establish that its Asserted Marks are famous, and that MSCHF's Infringing Shoes are likely to cause dilution of those marks by blurring or tarnishment, "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. §

25

1125(c)(1).  Vans' New York state dilution claim also requires proof of dilution by blurring or tarnishment, though "the plaintiff's mark need not be famous or celebrated."  *Uber Inc. v. Uber Techs., Inc.*, 521 F. Supp. 3d 455, 468 (S.D.N.Y. 2021).  Instead, "distinctiveness for the purpose of trademark dilution claims under New York state law has been equated with the strength of a mark for infringement purposes."  *Id.* at 469 (internal quotations and citations omitted).

Here, MSCHF cannot dispute that the Asserted Marks are famous.  Indeed, as noted above, numerous third-party sources have commented on the strength and fame of the OLD SKOOL Trade Dress and Side Stripe Mark, referring to the Side Stripe Mark as "famous" and "iconic," and recognizing the OLD SKOOL Shoe one of the most popular and sought-after sneakers in the world.  Regan Decl. ¶¶ 18, 22-23; Exs. 2-7.  Vans has also spent tens of millions of dollars promoting the Asserted Marks, selling millions of pairs of shoes featuring the Asserted Marks and earning billions in revenue from the sale of such shoes.  *Id.* ¶¶ 14, 20; Callahan Decl. ¶ 7.  Finally, consumer surveys have established that the OLD SKOOL Trade Dress has secondary meaning.  Wimmer Decl. ¶ 14; Ex. 5.  The Asserted Marks are therefore famous.

MSCHF's Infringing Shoes are also likely to dilute the Asserted Marks by both blurring and tarnishment.  For one, the factors establishing dilution by blurring under § 1125(c)(2)(B), including the degree of similarity between Infringing Shoes and the OLD SKOOL Trade Dress, all demonstrate that the Infringing Shoes are likely to impair the distinctiveness of the Asserted Marks.[2]  *See supra,* Section IV.A.2.b.  And as discussed above, the Infringing Shoes are likely to tarnish Vans' reputation by creating negative associations between Vans and MSCHF's

---

[2] The relevant factors include: (i) the degree of similarity between the mark and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark intended to create an association with the famous mark; (vi) any actual association between the mark and the famous mark. 15 U.S.C. § 1125(c)(1), (c)(2)(B).

dangerously constructed shoes.  *See supra,* Section IV.A.2.f; *see also Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497 at 507 (2d Cir. 1996) ("The *sine qua non* of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use.").

### C.    Vans is Likely to Suffer Irreparable Harm

Where a trademark plaintiff establishes a likelihood of success on liability, irreparable harm is presumed.  15 U.S.C. § 1116(a).  Therefore, because Vans is likely to succeed on the merits, it is entitled to a presumption of irreparable harm that favors preliminary relief, which MSCHF must rebut.

But even without a presumption, the irreparable harm to Vans if preliminary relief is not granted is obvious from the record.  "Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y.2011); *see also NYC Triathlon LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y.2010) ("Prospective loss of ... goodwill alone is sufficient to support a finding of irreparable harm.").  To that end, Vans has presented evidence of its significant and extensive investment in the Asserted Marks over decades.  *See supra*, Section II.  That investment has resulted in a tremendous level of goodwill and consumer recognition in Vans' trade dress and trademarks, which Vans will lose if MSCHF is allowed to sell its Infringing Shoes.  Callahan Decl. ¶¶ 12-19.

Additionally, because MSCHF has advertised its Infringing Shoes as a celebrity collaboration with Mr. Stevenson, Vans will also lose control of consumer perception regarding the celebrities with whom it collaborates, the design and quality of those collaborations, and how and in what frequency those collaborations are released and marketed.  Regan Decl. ¶ 29.  These

27

controls are critical to prevent oversaturation of the market and maintain Vans' reputation.  *Id.* ¶ 31 (discussing Vans' carefully constructed premium brand image).

Finally, Vans carefully controls the promotion and supply of its products to prevent damage to its reputation and goodwill from subpar or dangerous goods.  Callahan Decl. ¶¶ 12-19.  But MSCHF does not have the same standards, and MSCHF's alterations to the Infringing Shoes are likely impair the structural integrity of the sneakers, at the risk of consumer safety.  *Id.* MSCHF's intentional alteration of the OLD SKOOL Trade Dress to make it ***more harmful*** to consumers falls far short of Vans' strict standards, and the release of the Infringing Shoes would therefore deprive Vans of the ability to protect its brand from significant reputational harm.

For at least these reasons, absent a temporary restraining order and preliminary injunction, Vans will suffer irreparable harm to the reputation and goodwill it has built over decades.  Accordingly, in the unlikely event MSCHF is able to rebut the presumption of harm to Vans, the record evidence nonetheless also justifies preliminary relief.

### D.    The Balance of Equities Tips Decidedly in Vans' Favor

In contrast to the irreparable harm to Vans' goodwill and reputation if no preliminary relief is granted, the relative harm to MSCHF from not being able to release the Infringing Shoes is minimal.  Indeed, when, as here, a restraining order or preliminary injunction would maintain the status quo pending resolution of the litigation, the balance of equities tips in the movant's favor.  *See Perry Street Software, Inc. v. Jedi Techs., Inc.*, No. 20-cv-04539-CM, 2020 WL 6064168, at *7 (S.D.N.Y. Oct. 14, 2020).  MSCHF has yet to release its Infringing Shoes, so any order enjoining the release of those shoes would leave MSCHF in the position it is already in and would at most postpone the sales of only the Infringing Shoes, while leaving intact MSCHF's ability to sell other goods that do not infringe Vans' asserted rights.  Entering an injunction will

therefore cause only little if any harm to MSCHF's business, allowing it to continue as a going concern, while avoiding the significant harm to Vans if the status quo is not maintained.

### E.   Injunctive Relief Is in the Public Interest

An injunction would also serve the "'strong interest in preventing public confusion.'" *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 336 (S.D.N.Y. 2011) (citation omitted).  Because Vans has established that MSCHF's intended release of the Infringing Shoes is likely to confuse consumers (*see supra*, Section IV.A), granting an injunction will serve the public's interest in avoiding such confusion.  *See Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 504 (S.D.N.Y. 2013) (finding that "the public interest would not be disserved by the issuance of a preliminary injunction" because the plaintiff established that defendants' actions were likely to cause consumer confusion).

Ultimately, because Vans has demonstrated that it is "likely to succeed on the merits, that [it is] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest," Vans respectfully requests that the Court enter a restraining order enjoining the imminent release of the Infringing Shoes until a preliminary injunction is decided, and further enter a preliminary injunction enjoining any future releases of the shoes until a final adjudication on the merits.  Given the imminent planned release of the Infringing Shoes on April 18, 2022, Vans further requests the entry of a restraining order before the noon EST on April 18, or the entry of an order enjoining the planned release until the Court can entertain arguments on such restraining order.

### F.   The Bond Should be Minimal

Under Federal Rule of Civil Procedure 65(c), district courts have "wide discretion in the matter of security and it has been held proper for the court to require no bond where there has

29

been no proof of likelihood of harm." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Here, MSCHF will not be harmed by a preliminary injunction.  *See supra*, Section IV.D. MSCHF will not be restrained from using non-infringing marks to promote its products and business.  *Id.*  Moreover, Vans' likelihood of succeeding on the merits at trial is high (*see supra*, Section IV.A), making the likelihood of a "wrongful" injunction very low.  Vans therefore requests that the Court use its discretion to require no bond if an injunction is issued, or if it decides to require a bond, that any bond be nominal to account for the minimal harm to MSCHF.

## V.    CONCLUSION

For all the reasons set forth above, Vans requests that the Court grants Vans' application for a temporary restraining order and motion for a preliminary injunction, and issue Vans' proposed preliminary injunction against MSCHF.

Dated:  April 14, 2022                    Respectfully submitted,

                                          **McGuireWoods LLP**

                                          _____
                                          Philip A. Goldstein
                                          Michael L. Simes
                                          1251 Avenue of the Americas, 20th Floor
                                          New York, NY 10020
                                          Tel:  (212) 548-2167
                                          Fax:  (212) 715-6275
                                          pagoldstein@mcguirewoods.com
                                          msimes@mcguirewoods.com


                                          Tanya L. Greene (*pending pro hac vice*)
                                          Wells Fargo Center, South Tower
                                          355 S. Grand Ave., Suite 4200
                                          Los Angeles, CA 90071
                                          Tel:  (213) 457-9879
                                          Fax:  (213) 547-9899
                                          tgreene@mcguirewoods.com


                                          Lucy J. Wheatley (*pending pro hac vice*)
                                          Matthew G. Rosendahl (*pending pro hac vice*)
                                          800 East Canal Street
                                          Richmond, VA 23219
                                          Tel:  (804) 775-1000
                                          Fax: (804) 698-2016
                                          lwheatley@mcguirewoods.com
                                          mrosendahl@mcguirewoods.com


                                          Matthew W. Cornelia (*pending pro hac vice*)
                                          2000 McKinney Ave., Suite 1400
                                          Dallas, TX 75201
                                          Tel:  (214) 932-6400
                                          Fax:  (214) 932-6499
                                          mcornelia@mcguirewoods.com


                                          *Counsel for Plaintiffs*
                                          *Vans, Inc. and VF Outdoor, LLC*


                                          31