UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

VANS, INC. and VF OUTDOOR, LLC,

                Plaintiffs,

        v.

MSCHF PRODUCT STUDIO, INC.

              Defendant.

Case No. 1:22-cv-02156-WFK-RML

---

# DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

DEBEVOISE & PLIMPTON LLP
David H. Bernstein
Megan K. Bannigan
Marissa MacAneney
Timothy Cuffman
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6696
Fax:  (212) 521-7696
dhbernstein@debevoise.com
mkbannigan@debevoise.com
mkbannigan@debevoise.com
tcuffman@debevoise.com

SWANSON, MARTIN & BELL, LLP
William D. Patterson (*pro hac vice* forthcoming)
Nicole E. O'Toole (*pro hac vice* forthcoming)
330 N. Wabash, Suite 3300
Chicago, IL 60611
(312) 321-8445
wpatterson@smbtrials.com
notoole@smbtrials.com

MSCHF PRODUCT STUDIO, INC.
John Belcaster (*pro hac vice* forthcoming)
62 Bayard Street
Brooklyn, NY 11222
john@mschf.xyz

*Counsel for Defendant MSCHF Product Studio, Inc.*

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 2

I.   An Art Collective Known as (and for) MSCHF ................................................. 2

    A.   MSCHF's Art Often Critiques Consumerism and the Digital World. ................... 3

    B.   Sneakerhead Culture is Ripe for Parody. ............................................................. 4

II.  *Wavy Baby* ....................................................................................................... 4

ARGUMENT .............................................................................................................. 8

I.   Vans Is Not Likely to Succeed on the Merits of Its Trademark Infringement
Claims. ..................................................................................................................... 9

    A.   *Wavy Baby* is an artwork protected by the First Amendment. ............................. 9

    B.   Consumers are not likely to be confused by *Wavy Baby*. .................................. 10

II.  Vans Is Unlikely to Succeed on Its Dilution Claims ................................................. 19

III. Vans Faces No Irreparable Harm Absent an Injunction. ......................................... 22

IV.  The Balance of the Hardships Tips Toward MSCHF. ............................................. 23

V.   The Public Interest in Free Expression Weighs Against an Injunction. ................... 25

Conclusion ................................................................................................................ 25

i

# TABLE OF AUTHORITIES

**Cases**

*Agudath Israel of Am. v. Cuomo*, 979 F.3d 177 (2d Cir. 2020) ........................................... 9

*Apple, Inc. v. Samsung Elecs. Co.*,

    No. 11-CV-01846, 2011 WL 7036077 (N.D. Cal. Dec. 2, 2011) ................................. 23

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) ....................................................... 24

*BitTitan, Inc. v. SkyKick, Inc.*,

    No. 15-CV-0754, 2015 WL 5081130 (W.D. Wash. Aug. 27, 2015) ........................... 23

*Brown v. Elec. Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013) .................................................... 9

*Burnett v. Twentieth Century Fox Film Corp.*,

    491 F. Supp. 2d 962 (C.D. Cal. 2007) .......................................................................... 13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .................................... 10, 13, 25

*Car-Freshener Corp. v. Am. Covers, LLC*, 980 F.3d 314 (2d Cir. 2020) ......................... 18

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*,

    886 F.2d 490 (2d Cir. 1989) ......................................................................... 9, 11, 12, 14

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ........................................................................ 24

*Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806 (2d Cir. 1999) ...................... 11, 12, 13

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,

    73 F.3d 497 (2d Cir. 1996) ........................................................................................... 21

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ........................................................................ 20

*Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*,

    828 F.2d 1482 (10th Cir. 1987) ................................................................................... 15

*Kamerling v. Massanari*, 295 F.3d 206 (2d Cir. 2002)....................................................... 22

*Kotori Designs, LLC v. Living Well Spending Less, Inc.*,

    No. 16-CV-637, 2016 WL 6833004 (M.D. Fla. Nov. 21, 2016) ................................... 23

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,

    507 F.3d 252 (4th Cir. 2007) ............................................................................... passim

*Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*,

    868 F. Supp.2d 172 (S.D.N.Y. 2012) ............................................................................. 9

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,

    156 F. Supp. 3d 425 (S.D.N.Y.) .................................................................. 11, 13, 15, 21

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,

    674 F. App'x 16 (2d Cir. 2016) ................................................................................... 17

*Lydo Enters. Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984)............................ 23

*Lyons Partnership v. Giannoulas*, 179 F.3d 384 (5th Cir. 1999) ..................................... 13

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ............................................................................. 20

*Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*,

    239 F.3d 172 (2d Cir. 2001)......................................................................................... 24

*Michel v. Bare*, 230 F. Supp. 2d 1147 (D. Nev. 2002) .................................................... 24

*Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506 (2d Cir. 2005) ........................ 22

*OurBus, Inc. v. City of Ithaca, New York*,

    No. 19-CV-0356, 2019 WL 2710111 (N.D.N.Y. June 28, 2019)................................. 23

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ........................... 13

*Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316 (4th Cir. 2015) ................................ 14

iii

*Roberts v. Bliss*, 229 F. Supp. 3d 240 (S.D.N.Y. 2017)................................................... 13

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).................................................. 9, 12, 25

*Shred-It, USA, Inc. v. Mobile Data Shred, Inc.*,

202 F. Supp. 2d 228 (S.D.N.Y. 2002)............................................................................. 24

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,

588 F.3d 97 (2d Cir. 2009).............................................................................. 19, 20, 21

*Topanga Press, Inc. v. City of L.A.*, 989 F.2d 1524 (9th Cir. 1993) ................................ 23

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993) ................. 10

*Two Hands IP LLC v. Two Hands Am., Inc.*,

No. 21-CV-3855, 2021 WL 4437975 (S.D.N.Y. Sept. 28, 2021)................................. 19

*VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170 (9th Cir. 2020) ............... 10

*Winterland Concessions Co. v. Loren*,

1990 U.S. Dist. LEXIS 21079 (S.D. Cal. Apr. 17, 1990)............................................. 24

*Yankee Publ'g Inc. v. News Am. Publ'g Inc.*,

809 F. Supp. 267 (S.D.N.Y. 1992) ...................................................................... 10, 17

**Statutes**

15 U.S.C. § 1116(a) ......................................................................................................... 22

15 U.S.C. § 1125(c)(3)............................................................................................... 19, 20

**Other Authorities**

2 McCarthy on Trademarks and Unfair Competition § 11:85 (5th ed.) .......................... 14

H.R. Rep. 116-645 (2020)............................................................................................... 22

Defendant MSCHF Product Studio, Inc. ("MSCHF"), a Brooklyn-based art collective, respectfully submits this memorandum of law in opposition to the application for a temporary restraining order filed by Plaintiffs Vans, Inc. and VF Outdoor, LLC (together, "Vans").

## PRELIMINARY STATEMENT

The Court should deny Vans' application because Vans is unlikely to prevail on the merits, Vans would face no irreparable harm if the TRO is denied, the balance of hardships tips in MSCHF's favor, and the public interest in free expression weighs against an injunction.

MSCHF's *Wavy Baby* project is a limited-edition series of 4,000 wearable artworks that will be sold and shipped ***today***, as Vans has known since April 5. *See* Pl.'s Br. at 12. Because Vans waited until the last moment to seek a TRO, Vans' motion will be rendered moot to the extent the motion is not heard before the shoes are shipped. Moreover, *Wavy Baby* is unlikely to cause confusion because MSCHF's sneakerhead customers—who can purchase these works only through MSCHF's proprietary app—will know that these works come from MSCHF, not from Vans, and that they are produced in association with the famous rapper Tyga, not with Vans.

Further, even if there were some confusion, *Wavy Baby* is protected expression under the First Amendment. *Wavy Baby* comments on consumerism in sneakerhead culture (that Vans helped to create) and the intersection of the physical and virtual worlds (the boundary of which Vans straddles by selling "digital shoes" and other "digital skate gear" in the metaverse). Whereas Vans translates its functional skate shoes into digital goods used in games like Roblox, *Wavy Baby* translates warped digital representations of skate shoes into physical form. The result is an exaggerated "shoe" that is wobbly in shape, unique in appearance, and not practical for everyday wear (let alone balancing on a skateboard). Given the expressive nature of *Wavy Baby*, these works are protected expression and satisfy both prongs of the Second Circuit's seminal *Rogers v. Grimaldi* test. Vans' claims of infringement and dilution must give way because *Wavy*

*Baby* is expressive and does not explicitly confuse consumers.

Not only is Vans unlikely to succeed on the merits, but Vans' conduct establishes that it will not suffer irreparable harm from the sale of MSCHF's limited-edition artworks. Last week, Vans offered to allow MSCHF's "drop" of *Wavy Baby* to proceed as scheduled in return for a share of MSCHF's profits; Vans also agreed to a meeting between the parties to discuss potential future collaborations. That Vans would accept payment to allow the launch and expressed interest in future collaborations undermines Vans' protestations about the harm *Wavy Baby* will cause to its brand. It also demonstrates that any harm to Vans is not irreparable but rather compensable. In contrast, the harm to MSCHF's First Amendment rights and its reputation if today's launch is enjoined would be severe, especially given the extensive publicity around the launch. Given the substantial First Amendment issues at play in this case, an injunction would undermine the public's interest in advancing free expression and artistic endeavors.

## FACTUAL BACKGROUND

### I.   An Art Collective Known as (and for) MSCHF

*Digital Trends* concluded in 2020 that MSCHF makes "pop art for the internet age." Whaley Decl. ¶ 13. The *New York Times* dubbed MSCHF "the Banksys of consumer culture." *Id*. CNN describes MSCHF as a headline-making "art collective" that specializes in "'drops' -- a series of irreverent art projects." *Id*. MSCHF's stated mission is to use its artwork to "start a conversation about consumer culture . . . by participating in consumer culture." *Id.* ¶ 12. MSCHF announces its creative works in drops, which occur in roughly two-week intervals. Each drop is numbered sequentially, starting with Drop 1 a few years ago. In 2022 alone, MSCHF drops have critiqued: music (Drop 73); the U.S. political system (Drop 72); consumerism and digital media (Drops 66, 67, and 71); standardized testing (Drop 70); "Hallmark Holidays" (Drop 69); and the U.S. legal system (Drop 68). *Id.* ¶ 18. Many drops are accompanied by a manifesto, which adds

to, and becomes part of, the art. *Id.*

MSCHF's artworks have received wide acclaim from the press and art world alike. International fashion and art agency *Highsnobiety* discussed MSCHF art projects at length in a 2021 feature titled "The Museum of MSCHF: A Retrospective of the Creative Industry's Antiheroes." *Id.* ¶ 45. A panel at the auction house Christie's discussed MSCHF's *Birkinstock* shoe project and agreed that the work—created through the repurposing of disassembled Hermès Birkin bags onto iconic cork Birkenstock sandals—were not merely high fashion but undeniably "conceptual art." *Id.* ¶¶ 25, 48. Both the Design Museum of London and the Exhibition Subversive Design NRW-Forum in Dusseldorf have featured MSCHF artworks, including its *Birkinstocks*, *Jesus Shoes*, and *Satan Shoes* pieces. *Id.* ¶ 47. MSCHF also holds invitations from the Art Basel (one of the world's leading art fairs) and the Perrotin gallery (which ranks among the most renowned art galleries in the world) to exhibit its artwork later this year. *Id.* ¶ 49.

### A. MSCHF's Art Often Critiques Consumerism and the Digital World.

Of MSCHF's eleven drops so far this year, four have commented on consumerism and three have commented on our increasingly digitized world. One of this year's drops is a continuation of MSCHF's *Blur* series, which began with Drop 34, in which MSCHF displayed a blurred digital image of a stack of $20 bills. MSCHF's manifesto told its audience to "Buy now! . . . Don't overthink it. It's what you've always wanted, isn't it?" *Id.* ¶ 25. Once purchased, consumers learned that the image was just an unblurred image of a blurry 3D object. In an increasingly digitized world, the piece challenges conceptions of the boundary between the digital and physical worlds, while forcing MSCHF's customers to wonder why they buy what they buy. The auction house Phillips, which specializes in "the world's most important twentieth century and contemporary works of art," displayed a large version of the piece in its Manhattan

lobby, noting that it critiques consumer culture by "interrogating our desire to read value into an object, and the tantalization of the unknown." *See id.* ¶ 46.

**B.      Sneakerhead Culture is Ripe for Parody.**

Given MSCHF's penchant for critiquing consumer culture from within consumer culture, MSCHF realized that "sneakerhead" culture is ripe for parody. For most people, shoes are primarily utilitarian objects: to be worn, to help us balance and move, and to protect our feet. Yet there is now a $10 billion industry built around shoe ***collecting***, and shoes are increasingly being purchased and displayed as works of art. *Id.* ¶¶ 29–31. As *The New York Times* and *CNN.com* explain, for "sneakerheads," shoes are expressive, typically only displayed, and rarely worn— like fine art, sneakers are seen as investments. *Id.* ¶ 30. Companies like Flight Club have created stores just for buying and selling the world's most collectable shoes; others, like StockX, have created digital marketplaces to do the same and use non-fungible tokens ("NFTs") as proof of ownership of sneakers that are stored in climate-controlled vaults.

MSCHF has critiqued the consumerism inherent in sneakerhead culture in the past, first with *Jesus Shoes* in 2019, then with *Satan Shoes* in 2021. These projects parodied "collab culture," which describes the phenomenon of sneaker companies collaborating with *anyone* to garner clout and shoe sales. *Id.* ¶¶ 32–33; *see also* Pl. Br. at 12. MSCHF continued its critique of sneaker culture in February 2022, with its *TAP3* project, which took aim directly at the litigious disposition of certain sneaker companies by wrapping a shoe in bright yellow "MSCHF"-branded tape to communicate the source of the shoes as clearly as possible. *Id.* ¶ 37.

**II.      *Wavy Baby***

MSCHF's latest shoe-related artwork is *Wavy Baby*, which is set to drop at noon today. *Wavy Baby* packages MSCHF's usual biting commentary in a surreal, Dali-esque creation.

4

The *Wavy Baby* design process started with an image of *the* classic skate shoe—the Vans Old Skool. MSCHF selected the Old Skool because Vans occupies a peculiar place in the world, straddling the decades-old, hyper-physical skateboard culture and the more recent online consumer culture. Vans is unique in that it is both the most iconic, functional, cool skate shoe in history *and* an über-trendy, mass-consumed commodity, beloved by consumeristic sneakerheads and the masses alike. No other shoe embodies those dichotomies—niche and mass taste, functional and trendy, utilitarian and frivolous—as perfectly as the Old Skool, which made it the ideal shoe for MSCHF's interrogation of consumer desire. Wiesner Decl. ¶ 24. Furthermore, Vans also operates at the boundary between the physical and the virtual, selling "digital shoes" and other "digital skate gear" in the metaverse, translating physical goods into virtual goods. With *Wavy Baby*, MSCHF decided to invert that process, translating virtual goods back into physical goods—and thereby flipping Vans' project on its head. Whaley Decl. ¶ 40.

Inspired by their *Blur* series, the artists at MSCHF placed an image of an Old Skool shoe into Photoshop and applied the "liquify" digital filter to the image. The MSCHF team was excited about the results—the new design transformed an iconic, highly practical skate shoe into a "Cultural Readymade," evocative of Marcel Duchamp's famous, modern movement in art that has been extended by artists like Ai Weiwei. Wiesner Decl. ¶¶ 9–18. The liquified shoe had a profile unlike any other on the market—unique from nearly every angle. After tinkering with the profile, MSCHF found a manufacturer to produce *Wavy Baby*—which was a difficult feat given the project's uniqueness and limited quantity—and set out to change the sneaker industry.

Although MSCHF invoked Old Skool as the cultural and physical anchor when creating its art, *Wavy Baby* is unlike anything Vans—or any other company—has ever produced. *Wavy Baby* is constructed with a metal plate in the sole and a plastic bridge to support its liquified

shape; *Wavy Baby* is taller, and has a sidewall that is twice as thick as Vans' owing to an injection molding process (as opposed to Vans' vulcanization process); *Wavy Baby* is nearly three-times heavier than Vans Old Skool shoe; the distinctive wavy shape of the sole of *Wavy Baby* drastically minimizes the surface contact the *Wavy Baby* has with any walking surface, while the Vans' sole lays almost perfectly flat; *Wavy Baby*'s striping is indented, rather than grooved or tiered like Vans'; the stitching on the *Wavy Baby* is liquified, like the sole, which causes the lines of stitching to oscillate and overlap in an irregular pattern, unlike the Old Skool's crisp, parallel double-stitching; the *Wavy Baby* toebox is wider than the Old Skool toebox; and the *Wavy Baby* includes a blatant, bold warning label on its sole, which cautions consumers that the *Wavy Baby* is "EXTREMELY WAVY" and that anyone who wears the *Wavy Baby* assumes risk of injury and even death. *Id.* ¶ 61. All of these differences, among others, create stark contrasts with Vans' Old Skool shoe, and give *Wavy Baby* an unprecedented, revolutionary design.



Through this design, MSCHF forces questions on sneaker culture by participating in the culture itself. But rather than offering a functional sneaker to sneakerheads, the *Wavy Baby* is a liquified version of the classic skate shoe profile. As MSCHF wrote in its manifesto, *Wavy Baby* is "a complete distortion of an entire object that is itself a symbol." *Id.* ¶ 49. Although wearable, *Wavy Baby* is less comfortable and less functional as a shoe than standard sneakers. *Wavy Baby* is a Cultural Readymade—meant to be bought, owned, displayed, and worn occasionally as a cumbersome fashion accessory (but not as a sneaker, let alone as a skate shoe). *Id.* ¶¶ 56–59.

More importantly, *Wavy Baby* questions consumers' relationship between the physical and digital worlds, and how goods like Old Skools become mass-commodities in the digital age. How does a brand that, as Vans claims, "embod[ies] Southern California counterculture," Pl.'s Br. at 5, become bland *mass* culture? Vans (and Old Skool in particular) occupies a unique position, straddling the line between niche utilitarian skate shoe and trendy consumer commodity. Wiesner Decl. ¶ 24. Vans itself blurs the lines between physical and virtual goods, directly participating in our retreat from the physical world to a digital one by selling virtual "Vans shoes" in the Roblox metaverse. By "smash[ing] the digital and the physical together in an object," *Wavy Baby* inverts that retreat, translating virtual shoes back into physical goods, leaving behind a bizarre remnant that questions whether we can re-emerge from our digital lives—on social media, for example, where images and videos of Vans abound—without also being fundamentally warped. Whaley Decl. ¶ 40.

In doing so, *Wavy Baby* carries forth the spirit of surrealist artist René Magritte, who in 1929 released *The Treachery of Images*, a painting of an object that *looks* like an early twentieth century smoking pipe but, bafflingly, bears the inscription "Ceci n'est pas une pipe" (i.e., "This is not a pipe"). Just as Magritte's painting probed the line between two-dimensional representation and the "real world" itself, *Wavy Baby* presents a three-dimensional sculpture in the vague form of a skate shoe rather than a skate shoe itself. As MSCHF wrote in its manifesto, "This is not a skate shoe – Ceci n'est pas une chaussure de skate." Wiesner Decl. ¶¶ 49–50.





Reinforcing MSCHF's critique of the role of technology in our lives is the unique *Wavy Baby* branding, which features a

7

humorous, cartoonish rendering of former President George W. Bush falling off a Segway. Furthering *Wavy Baby*'s critique of our descent into virtual worlds, Grammy-nominated artists Tyga and Doja Cat use *Wavy Baby*—and a lot of computer-generated imagery—to create a wobbly, surreal music video for their duet "Freaky Deaky." Wiesner Decl. ¶¶ 41, 71–74.

Even though *Wavy Baby* will not be released for another few hours, the public reaction to the shoe indicates that these messages have already been heard and understood. The shoe blog *SneakerFreaker* notes that *Wavy Baby* creates a "Dali-esque" impression. *Id.* ¶ 83. Appearing to take literally MSCHF's tongue-in-cheek directive to "get liquid, with our assets, our diets, and our shoes," and in an unsubtle allusion to Salvador Dali's *The Persistence of Memory*, *Highsnobiety* posted a video to TikTok "melting" a pair of the Vans Old Skool shoes in a microwave in order to create their own version of *Wavy Baby*. *Id.* ¶ 88. On April 7, 2022, an Instagram user posted a meme suggesting people could make their own *Wavy Baby* by taking a pair of Vans Old Skools and running them through a pasta maker. *Id.* ¶ 87. Like *Wavy Baby* itself, these memes pose the question—why warp or melt a shoe and why buy a warped or melted "shoe"?

*Wavy Baby* is a work of modern art, a centerpiece for discourse, and the result of nearly a year of innovation and creativity. Like the other footwear-related artworks in MSCHF's collection, *Wavy Baby* is a piece that inevitably will find its way to art galleries and museums, but its purpose remains to challenge sneaker culture from within, addressing both our consumerist instincts and our perception of reality.

## ARGUMENT

In order to obtain a TRO, Vans must prove that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of emergency relief; (3) the balance of equities tip in its favor; and (4) an injunction is in the public's interest. *Agudath Israel of Am. v.*

*Cuomo*, 979 F.3d 177, 180 (2d Cir. 2020). Vans cannot prove any of these elements.

**I.      Vans Is Not Likely to Succeed on the Merits of Its Trademark Infringement Claims.**

Vans' Lanham Act claims are precluded by the First Amendment and *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). Moreover, *Wavy Baby* is a parody; no reasonable consumer would be confused into thinking that *Wavy Baby* was produced or endorsed by Vans.

**A.      *Wavy Baby* is an artwork protected by the First Amendment.**

An injunction would unconstitutionally restrain MSCHF's free speech because its parody of Vans is protected First Amendment expression. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) ("[P]arody is a form of artistic expression, protected by the First Amendment."). Under *Rogers*, works of artistic expression that are accused of trademark infringement, like *Wavy Baby*, are shielded from claims of infringement so long as the use is (1) relevant to the expression and (2) not explicitly misleading. 875 F.2d at 999. That is true even if the works are sold commercially. *Cliffs Notes*, 886 F.2d at 495 (*Spy Notes* books that parody *Cliffs Notes* books protected by First Amendment even though sold commercially).

MSCHF's references to Vans' Old Skools are relevant to—indeed, they are *essential* to—its expressive purpose. As expressed in MSCHF's manifesto about the project, *Wavy Baby* is a warped rendition of Vans, rendering what could previously only be seen digitally into something physical, and critiquing consumer culture and Vans' outsized role in that culture. Whaley Decl. ¶ 40. Accordingly, *Wavy Baby* easily clears the *Rogers* bar for artistic relevance, which is "purposely low and will be satisfied unless the use 'has *no* artistic relevance to the underlying work *whatsoever*.'" *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp.2d 172, 178 (S.D.N.Y. 2012) (quoting *Rogers*, 875 F.2d at 999). *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245 (9th Cir. 2013) ("[E]ven the slightest artistic relevance" is enough to pass *Rogers*).

The facts in this case are even stronger than those in *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, in which the Ninth Circuit, applying *Rogers*, found that a rubber dog toy in the shape of a Jack Daniels whiskey bottle that tweaked the Jack Daniels trade dress was expressive, rendering a "simple" and "humorous" message. 953 F.3d 1170, 1175–76 (9th Cir. 2020). If a $15 dog toy that pokes slight fun at a bottle of whiskey can be protected by the First Amendment, surely the use of Vans' transformed trade dress in a $220 work of art as part of an art collective's commentary on Vans' role in consumerism and digital society is artistically relevant to the work.

Whether Vans recognizes MSCHF's commentary or thinks it's funny or thought-provoking is irrelevant. *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 280 (S.D.N.Y. 1992) ("[T]he obscurity of [the defendant's] joke [with its *New York* magazine cover in the style of the *Old Farmer's Almanac*] does not deprive it of First Amendment support."); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 (1994) ("First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed").

Furthermore, *Wavy Baby* is not "explicitly misleading." Second Circuit case law applying *Rogers* is clear that, in order for an expressive work to violate the Lanham Act, a finding of likelihood of confusion must be "particularly compelling" to outweigh the defendant's expressive interest. *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993). As explained below, *Wavy Baby* creates no likelihood of confusion, but even if it did, that likelihood of confusion would be far outweighed by MSCHF's First Amendment interests.

**B.    Consumers are not likely to be confused by *Wavy Baby*.**

Vans has failed to show a likelihood of confusion. MSCHF has made clear in its advertising and packaging that *Wavy Baby* is a collaboration with Tyga, not with Vans. *See* Wiesner Decl. ¶¶ 62–66. Commentators have readily recognized the differences between *Wavy*

*Baby* and Old Skools and that *Wavy Baby* comes from MSCHF and Tyga. *See Id.* ¶¶ 79–82.

When the *Polaroid* factors are applied to *Wavy Baby*, they show confusion is not likely. That is especially true when those factors are "applied with proper weight given to First Amendment considerations," since "the *Polaroid* test is at best awkward" in cases involving the First Amendment. *Cliffs Notes*, 886 F.2d at 495 n.3. For that reason, courts routinely recognize that parodies require more protection than ordinary, non-parodic commercial products. *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 261, 267 (4th Cir. 2007) (a successful parody "influences the way in which the [likelihood of confusion] factors are applied).

Courts regularly find no likelihood of confusion with parodic consumer goods. For example, in *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, the court held that "defendant's use of [Louis Vuitton's famous] mark [on a tote bag called My Other Bag] is an obvious parody or pun, readily so perceived, and unlikely to cause confusion among consumers." 156 F. Supp. 3d 425, 443 (S.D.N.Y.), *aff'd*, 674 F. App'x 16 (2d Cir. 2016). Similarly, in *Haute Diggity Dog*, in which defendant "mimicked" Louis Vuitton's handbags on its dog toys that were "designed … to imitate and suggest, but not *use*," the plaintiff's marks, the Fourth Circuit affirmed summary judgment for defendant: "No one can doubt that LVM handbags are the target of the imitation by Haute Diggity Dog's 'Chewy Vuiton' dog toys" and "no one can doubt also that the 'Chewy Vuiton' dog toy is not the 'idealized image' of the mark created by LVM. The differences are immediate." 507 F.3d at 260, 262, 268. *Wavy Baby*'s parody is just as apparent, as it is clearly and humorously different from the iconic Vans shoes from which MSCHF took its inspiration. The exaggerated warning label on the Wavy Baby sole (itself a parody of legal disclaimers) also underscores that difference.

Vans cites *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812–13 (2d Cir. 1999) for

11

the principle that "parodic use or artistic alteration of a mark is 'sharply limited' in circumstances where, as here, 'an alleged parody of a competitor's mark [is used] to sell a competing product.'" Pl.'s Br. at 24. But that characterization of *Harley Davidson* misapplies the court's holding, and ignores the long line of cases protecting expression in circumstances like this. Although the defendant in *Harley Davidson* claimed parody, the court held that defendant's use was ***not*** a "parody" at all within the meaning of trademark law (let alone an "artistic alteration"). As the court explained, the defendant "ma[de] no comment on Harley's mark" and instead "simply use[d] [Harley Davidsons' marks] somewhat humorously to promote his own products and services, which is not a permitted trademark parody use." *Harley Davidson*, 164 F.3d at 813. Here, in contrast, *Wavy Baby* comments directly on Vans. The *Harley Davidson* court further explained that, in contrast to *Cliffs Notes*, 886 F.2d 490 (in which a book's parody of another book was protected) and *Rogers*, 875 F.2d 994 (in which a film's use of a film star's name was protected), the defendant used Harley Davidson's marks ***as its own trademarks*** to advertise its ***non-expressive*** motorcycle repair services, which were in ***direct competition*** with Harley Davidson's services. *Harley Davidson*, 164 F.3d at 812–13. The facts of this case are close to *Cliffs Notes* and *Rogers*, and they are far from *Harley Davidson*. *Wavy Baby* is an expressive good, like the goods in *Cliffs* and *Rogers*, and unlike the competitive motorcycle services offered by the defendant in *Harley Davidson*. Comparing these precedents makes clear that *Harley Davidson* took aim at commercial uses of trademarks for services substituting for plaintiff's, not expressive parodies of marks that happen to appear on the same general class of goods as the plaintiff's goods and do not replace or substitute for plaintiff's goods.

The bizarre and unconventional shape of *Wavy Baby* undermines any risk of confusion, in part because *Wavy Baby* cannot substitute for Old Skools. Indeed, no reasonable consumer who

has any familiarity with Vans would conclude that *Wavy Baby* is anything but an exaggerated artwork by someone other than Vans. Courts recognize that the more outlandish a parody, the less likely consumers are to think the trademark owner sponsored or approved it. *Roberts v. Bliss*, 229 F. Supp. 3d 240, 252–53 (S.D.N.Y. 2017) (parody where a modification was "obvious, or "outlandish," "not subtle," and/or a "conscious departure" from original work); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 972 (C.D. Cal. 2007) ("[T]he more distasteful and bizarre the parody, the less likely the public is to mistakenly think that the trademark owner has sponsored or approved it."). That *Wavy Baby* comments on more than *just* Vans does not undermine its status as parody. *My Other Bag*, 156 F. Supp. 3d at 436 ("[T]hat MOB's totes convey a message about more than just Louis Vuitton bags is not fatal to a successful parody defense" (citing *Campbell*, 510 U.S. at 580; *Harley–Davidson*, 164 F.3d at 813)).

Furthermore, as discussed below, nearly all of the *Polaroid* factors weigh strongly in MSCHF's favor. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

      1.    **Strength of the mark – The Vans Old Skool marks are simultaneously iconic (which undermines any risk of confusion in this case) and weak (because they exist in a crowded field).**

Vans' allegation that its marks are strong and famous, *see* Pl.'s Br. at 17–18, undermines its claims of confusion in this case. Courts recognize that the stronger a plaintiff's trademark, the *less* likely consumers are to be confused by a parody. *See My Other Bag*, 156 F. Supp. 3d at 441 ("The strength and recognizability of the mark may make it easier for the audience to realize that the use is a parody and a joke. . . . Louis Vuitton's marks are so well known that consumers are likely both immediately to recognize the target of the joke and to appreciate the obvious changes to the marks that constitute the joke.'"); *Lyons Partnership v. Giannoulas*, 179 F.3d 384, 389 (5th Cir. 1999) ("[T]he strength of the mark may actually make it easier for the consumer to

realize that the use is a parody."); *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 324–25 (4th Cir. 2015) ("[T]he strength of the mark and the similarity between the marks often work in reverse for cases of parody and satire as compared to a standard infringement case.").

At the same time, Vans' marks, even if famous, are weak. The market is flooded with shoes that look very similar to Vans' Old Skools—including shoes that incorporate a similar upper, a waffle sole, and/or a side "jazz" stripe—or have a name similar to WAYVEE, which renders Vans' rights narrow and confined to its specific designs. *See* MacAneney Decl. ¶¶ 3–6; 2 McCarthy on Trademarks and Unfair Competition § 11:85 (5th ed.) ("In a 'crowded' field of look-alike marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd. . . . In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other.").

2.      **Degree of similarity –** *Wavy Baby* **is reminiscent of Old Skool sneakers while differing from them in nearly every way.**

*Wavy Baby* reminds consumers of Vans' Old Skool sneakers—but that is not sufficient for a finding of infringement. Indeed, in order for any parody to be a parody, it ***must*** reference another party's mark. *See Cliffs Notes*, 886 F.2d at 494 ("A parody must convey two simultaneous—and contradictory—messages: that it is the original but also that it is not the original and is instead a parody."). MSCHF did just that with the *Wavy Baby* project.

Even still, *Wavy Baby* does not directly reproduce *any* of Vans' alleged trademarks. Each purported use of the marks is different than Vans' use. Wiesner Decl. ¶¶ 25–46, 61–66. Furthermore, as explained above, the market is flooded with shoes that look very similar to Old Skools, MacAneney Decl. ¶¶ 3–6, which heightens consumer awareness that even subtle differences between shoes can signal that they come from a different source. Here, as the Court will see most clearly when MSCHF presents the physical shoes to the Court in person for

inspection, the differences between MSCHF's *Wavy Baby* and Vans' sneakers are anything but subtle. The differences "build[] significant distance" between the Vans shoes and *Wavy Baby*, supporting a finding that confusion is unlikely. *See My Other Bag*, 156 F. Supp. 3d at 435.

3. **Good faith – MSCHF distorted certain elements of Vans' Old Skools as part of a good-faith parody.**

Vans can cite no evidence that MSCHF designed the *Wavy Baby* work in bad faith. *Wavy Baby* is not branded as Vans. MSCHF never claimed an affiliation to Vans or represented that Vans was involved in the *Wavy Baby* project. MSCHF's website contains no mention of Vans anywhere. The shoes come in a *Wavy Baby* box that prominently displays the names of MSCHF and Tyga, not a Vans box. When consumers open the box, the first thing they see is a bright yellow MSCHF Sneakers card laying on top of tissue paper. Wiesner Decl. ¶¶ 45, 65. Consumers can purchase the shoes only today and only from MSCHF's proprietary MSCHF Sneakers app, where MSCHF's branding is plainly obvious. Whaley Decl. ¶¶ 36, 44.

MSCHF's use of the Old Skool marks for inspiration cannot support a finding of bad faith. *See My Other Bag*, 156 F. Supp. 3d at 443 ("In the context of parody . . . [evidence that defendant knowingly parodied plaintiff's mark] does not show that defendant acted with the intent relevant in trademark cases—that is, an intent to capitalize on consumer deception or hitch a free ride on plaintiff's good will."); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir. 1987) ("Our single concern here . . . is whether an intent to parody an existing trademark supports an inference of a likelihood of confusion under the reasoning that one who chooses a mark similar to an existing mark intends to confuse the public. We hold that it does not."); *Haute Diggity Dogg*, 507 F.3d at 263 ("[Intent to parody] does not amount to a bad faith intent to create consumer confusion. To the contrary, the intent is to do just the opposite—to evoke a humorous, satirical association that *distinguishes* the products.").

4. **Sophistication – Purchasers of the *Wavy Shoes* will be sophisticated sneaker collectors and fans of the artistic works of MSCHF and Tyga who will recognize that *Wavy Baby* was neither produced by nor endorsed by Vans.**

Very few, if any, of the purchasers of *Wavy Baby* are likely to be unsophisticated members of the general public, as *Wavy Baby* will be available only today to a limited, self-selecting group of consumers who downloaded the MSCHF Sneakers app. MSCHF anticipates that many, if not the majority, of the purchasers of W*avy Baby* (like the purchasers of its previous sneaker-related artworks, including the *Jesus Shoes* and *Satan Shoes*) will be sneaker, streetwear, and art collectors, who keep their collections in boxes or displayed on shelves. Wiesner Decl. ¶ 76. These are individuals who pay close attention to the minute details of the goods they collect. Other purchasers are likely to include fans of MSCHF's work (who are well aware of MSCHF's past projects, such as the *Jesus Shoes* and *Satan Shoes*, and MSCHF's general approach to its art) and fans of Tyga. These are all sophisticated purchasers who are unlikely to be confused about the source of *Wavy Bab*y.

*Wavy Baby* is not an inexpensive consumer good. They will be sold for $220, compared to $60–65 for a standard pair of Vans Old Skools. Consumers know they are not spending $220 for a pair of Old Skools. They will be willing to pay a premium price for a work of art, knowing that they are not sneakers for skateboarding or walking their dog at the park. *See Haute Diggity Dog*, 507 F.3d 252, 267 (4th Cir. 2007) (difference in price between Louis Vuitton bag and Chewy Vuiton dog toy undermines likelihood of confusion).

Because purchasers are sophisticated, they will be attuned to subtle differences. And, because the differences between *Wavy Baby* and Old Skools are so obvious, purchasers are unlikely to believe *Wavy Baby* was produced by or endorsed by Vans.

16

5.     **Proximity of the Goods –** *Wavy Baby* **is a limited-edition, collectible work of art that is not proximate to or competitive with Old Skools.**

The Vans Old Skool shoes and the MSCHF *Wavy Baby* project are not proximate goods. Vans are street and skater shoes; they are simple and practical, meant to be worn. In contrast, *Wavy Baby* "shoes" are artworks, not standard sneakers—they are likely to be kept in glass cases or on shelves. It is difficult to walk in *Wavy Baby* for long distances, let alone skate in them, and they cannot safely be worn to walk down stairs. *See* Wiesner Decl. ¶ 61. In short, no reasonable person would think that these $220 anti-utilitarian "shoes" were produced by the same company that produces the $60 highly utilitarian Old Skool sneakers. *See My Other Bag*, 674 F. App'x at 18 (noting "the lack of market proximity" of two bags in finding no likelihood of confusion).

The lack of proximity between the goods is further demonstrated by the fact that *Wavy Baby* will be sold in a completely different channel of commerce than the Old Skools. Vans shoes are available from major retailers, including Zappos, Foot Locker, Dicks Sporting Goods, Kohls, and Amazon. *See* Pl.'s Br. at 5. In contrast, the 4,000 limited copies of *Wavy Baby* will be available for sale *exclusively* through MSCHF's proprietary website and mobile app. *Wavy Baby* will be sold to a completely different demographic of consumers than Vans—specifically, a self-selecting group of consumers who downloaded the MSCHF Sneakers app, who are likely to be sneakerhead and MSCHF fans—none of whom are likely to be confused as to source.

6.     **Bridging the Gap – Vans has never and would never produce shoes even remotely like the** *Wavy Baby* **sneakers.**

Vans produces shoes in different styles and colorways, including "customized versions" of its shoes, Pl.'s Br. at 25, but they are all highly utilitarian and uniform. *Wavy Baby* is unlike anything Vans—or any other shoe company—has ever made. It is highly unlikely that Vans is going to expand into the business of anti-utilitarian warped or wavy shoe-like artworks, and Vans does not allege otherwise. *See Yankee Pub.*, 809 F. Supp. at 274 ("[D]espite superficial

17

appearance of proximity of [magazine and almanac], the products are more realistically far apart" in light of their differences in subjects and customer bases, and the lack of evidence that either company would seek to bridge the gap to focus its sales efforts on the customer base of the other). Nor would consumers expect Vans to expand its offerings and sell something like *Wavy Baby*. This is a project only artists like MSCHF and Tyga would pursue.

> 7.    **Actual Confusion – Vans presents no evidence of consumer confusion, and there is abundant evidence that consumers are *not* confused as to the source of *Wavy Baby* and the lack of endorsement by Vans.**

Vans cites no credible evidence of actual consumer confusion. Instead, it cites two articles that demonstrate that consumers ***are not*** confused about the source of *Wavy Baby* or Vans' lack of involvement in the project. Vans cites an article titled "MSCHF and Tyga's 'Wavy Baby' Sneakers Seriously Distort Classic Vans," which explicitly identifies the source of *Wavy Baby* as "MSCHF and Tyga" and says that they "Distort" Vans rather than collaborate with Vans. *See* Pl.'s Br. at 22. Vans also cites an article that uses the phrase "MSCHF x Vans Baby Wave" in the headline. *Id.* However, the article makes clear that *Wavy Baby* is "[t]he result of a collab between MSCHF and Tyga," not between MSCHF and Vans. The headline is a reference to the fact that *Wavy Baby* uses "skateboard-inspired uppers [that] are well-know [sic] among the community." Even if this article were evidence of confusion, it is only one article about *Wavy Baby* and is de minimis. *Car-Freshener Corp. v. Am. Covers, LLC*, 980 F.3d 314, 332 (2d Cir. 2020) (a single instance of confusion failed to create a triable issue of fact on actual confusion prong). Dozens of other articles demonstrate that consumers understand that *Wavy Baby* was not produced by Vans. Many articles about *Wavy Baby* do not mention Vans at all. For example, an article in *A Good Outfit* notes that "Tyga is teaming up with MSCHF for his own pair of signature sneakers," describing MSCHF as "an art collective that creates unique products," with no mention of Vans. Even articles that mention *Wavy Baby*'s similarity to Old Skools clearly

identify the project as coming from MSCHF and Tyga, not Vans. *See* Wiesner Decl. ¶¶ 79–82.

In any event, the articles cited by Vans do not evidence confusion affecting purchasing decisions, which is required to satisfy the actual-confusion *Polaroid* factor. *See Two Hands IP LLC v. Two Hands Am., Inc.*, No. 21-CV-3855, 2021 WL 4437975, at *10 (S.D.N.Y. Sept. 28, 2021) (plaintiff's evidence of mistaken social media posts is insufficient to show actual confusion because, "[e]ven assuming the mistaken posts demonstrate confusion in the general sense, '[n]o evidence links the confusion evinced by the [posts] to any potential or actual effect on customers' purchasing decisions," so it "is therefore not the type of confusion that can satisfy this *Polaroid* factor."). The articles cited by Vans do not reference purchasing decisions at all.

## II.    Vans Is Unlikely to Succeed on Its Dilution Claims

To state a dilution claim, Vans must show that MSCHF used its famous mark in a way that is likely to impair the distinctiveness of the mark (for a dilution-by-blurring claim) or is likely to harm the reputation of the famous mark (for a dilution-by-tarnishment claim). *See Haute Diggity Dog*, 507 F.3d at 264–65. Vans cannot prove these elements, and even if it could, its claims are precluded by the First Amendment.

Dilution claims must fail when the accused work "identif[ies] and parod[ies], criticiz[es], or comment[s] upon the famous mark owner or the goods or services of the famous mark owner." 15 U.S.C. § 1125(c)(3)(A)(ii). Accordingly, because *Wavy Baby* parodies and comments on the Vans Old Skool sneakers, Vans' dilution claims are precluded by 15 U.S.C. § 1125(c)(3) as fair use. Vans cites *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 113 (2d Cir. 2009) for its assertion that "parody marks also cannot themselves be used to indicate the source or sponsorship of a good," presumably referring to the trademark-use exception to fair use under 15 U.S.C. § 1125(c)(3)(A). Pl's. Br. at 24. Vans misstates the law, because, even if a use isn't

"fair use," the dilution statute does not preclude a court from considering parody in deciding whether the plaintiff has made out a claim for dilution. *Haute Diggity Dog*, 507 F.3d at 266–67. More importantly, MSCHF did not make a trademark use of any of Vans' marks, so the exception to fair use under 15 U.S.C. § 1125(c)(3)(A) does not apply. Whereas the defendant in *Starbucks* indisputably used CHARBUCKS as a trademark for its coffee, MSCHF is not using any Vans marks (or anything substantially similar to Vans marks) to designate the source of *Wavy Baby*. Instead, MSCHF uses "MSCHF X TYGA" and "WAVY BABY" to indicate the source of the project. Each of these marks clearly indicates that the project was created by someone other than Vans. All other elements of *Wavy Baby* are merely ornamental, parodic features of the work that are not used as trademarks.[1]

Even if Vans' dilution claims were not precluded by 15 U.S.C. § 1125(c)(3), they raise the same First Amendment concerns as Vans' infringement claims. *See VIP Prods.*, 953 F.3d at 1176 (because dog toy was expressive, it was noncommercial for purposes of dilution act and, "[w]hen the use of a mark is 'noncommercial,' there can be no dilution by tarnishment."); 6 McCarthy § 31:153 ("When businesses seek the national spotlight, part of the territory includes accepting a certain amount of ridicule. The First Amendment, which protects individuals from laws infringing free expression, allows such ridicule in the form of parody."). Moreover, there is a substantial question about whether the anti-tarnishment provision of the Trademark Dilution Revision Act is even constitutional, in light of the Supreme Court's *Matal v. Tam*, 137 S. Ct. 1744 (2017) and *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) decisions, given the Court's holdings

---

[1]   Further, as the Second Circuit noted, the CHARBUCKS name was being used "as a beacon to identify Charbucks as a coffee that competes at the same level and quality as Starbucks in producing dark-roasted coffees." *Starbucks*, 588 F.3d at 113. Here, it is the exact opposite: *Wavy Baby* is identified as an entirely different "level and quality" as the Old Skool. Rather than compete with a balanced skate shoe, it's the unbalanced opposite.

that the First Amendment bars viewpoint discrimination in the trademark context, which is exactly what dilution by tarnishment does.

Furthermore, where a parody is at issue, dilution by blurring is unlikely. *See My Other Bag*, 156 F. Supp. 3d at 440 (dismissing a dilution claim because "while [defendant] deliberately uses, or at least evokes, Louis Vuitton's trademarks, it does so . . . only partially and certainly imperfectly, so as to convey the simultaneous message that it was not in fact a source of [Louis Vuitton] products"); *Haute Diggity Dog*, 507 F.3d at 261, 267 ("By making the famous mark an object of the parody, a successful parody might actually enhance the famous mark's distinctiveness by making it an icon"); *cf. Starbucks*, 588 F.3d at 113 (using mark not for parody or satire but as "beacon to identify Charbucks as a coffee that competes at the same level and quality as Starbucks in producing dark-roasted coffees").

Blurring is especially unlikely where the plaintiff's marks are famous and widely recognized, as Vans alleges its marks to be, and even more so because MSCHF's drop is limited to 4,000 pairs of *Wavy Baby*. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) ("There is very little likelihood that Henson's parody will weaken the association between the mark SPAM and Hormel's luncheon meat. Instead, like other spoofs, Henson's parody will tend[] to increase public identification of Hormel's mark with Hormel.") (quotation marks omitted); *My Other Bag*, 156 F. Supp. 3d at 440 (holding that Louis Vuitton's "fame and recognition only make it *less likely* that [defendant's] use would impair the distinctiveness of Louis Vuitton's marks."); *Haute Diggity Dog*, 507 F.3d at 267 ("[B]ecause the famous mark is particularly strong and distinctive, it becomes more likely that a parody will not impair the distinctiveness of the mark.").

III.    **Vans Faces No Irreparable Harm Absent an Injunction.**

Issuance of a TRO is a drastic and extraordinary measure that is not warranted unless the

plaintiff shows that imminent and immediate irreparable harm will befall it without that

emergency relief. *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

Indeed, "[t]he showing of irreparable harm is . . . the single most important prerequisite for the

issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)

(internal quotation marks omitted). Vans cannot carry its burden.

As a threshold matter, Vans has failed to demonstrate a likelihood of success on the

merits, so the presumption of irreparable harm does not apply. *See* 15 U.S.C. § 1116(a). Even if

Vans had shown a likelihood of success on the merits, the presumption would not apply because,

as the legislative history of the Trademark Modernization Act (which codified the presumption

of irreparable harm) makes clear, the application of *Rogers* trumps the presumption:

> In enacting this legislation, the Committee intends and expects that courts will
> continue to apply the *Rogers* standard to cabin the reach of the Lanham Act in
> cases involving expressive works. The Committee believes that the adoption by a
> court of a test that departs from Rogers, including any that might require a court
> to engage in fact-intensive inquiries and pass judgment on a creator's ''artistic
> motives'' in order to evaluate Lanham Act claims in the expressive-works context
> would be contrary to the Congressional understanding of how the Lanham Act
> should properly operate to protect important First Amendment considerations, and
> upon which the Committee is relying in clarifying the standard for assessing
> irreparable harm when considering injunctive relief.

H.R. Rep. 116-645, at 20 (2020).

Furthermore, immediate relief is neither necessary nor warranted. MSCHF's *Wavy Baby*

does not compete with Vans and are not even designed to be worn as everyday footwear. Vans

will not be irreparably harmed by people purchasing unique artworks to display in their homes,

at art museums or galleries, or as part of a high-fashion wardrobe ensemble; instead, it is

MSCHF who will be irreparably harmed if Vans is permitted to tread on its First Amendment

rights. *See Topanga Press, Inc. v. City of L.A.*, 989 F.2d 1524, 1528 (9th Cir. 1993) ("Any loss of First Amendment freedoms, even briefly, can constitute irreparable injury.") (quoting *Lydo Enters. Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984)).

Further proof that Vans will not be irreparably harmed is that, in the days leading up to this lawsuit, Vans offered to settle the dispute and allow the drop to proceed today in exchange for Vans receiving a percentage of MSCHF's profits. Vans even indicated that it was willing to meet with MSCHF in order to explore future collaborations between MSCHF and Vans, including involving future drops of *Wavy Baby*. Bernstein Decl. ¶¶ 2–7. Vans willingness to accept a payment in return for allowing the drop to proceed is "wholly inconsistent with—and therefore fatal to—a claim of imminent irreparable harm." *See OurBus, Inc. v. City of Ithaca, New York*, No. 19-CV-0356, 2019 WL 2710111, at *13 (N.D.N.Y. June 28, 2019) (quoting *Kotori Designs, LLC v. Living Well Spending Less, Inc.*, No. 16-CV-637, 2016 WL 6833004, at *3 (M.D. Fla. Nov. 21, 2016)).[2] Furthermore, Vans' willingness to consider collaborating with MSCHF on future *Wavy Baby*-related projects undermines any claim that the *Wavy Baby* drop is going to cause grievous harm to the Vans brand. Even if Vans can prove its claims at trial, its willingness to accept payment now shows that any harm is compensable.

## IV. The Balance of the Hardships Tips Toward MSCHF.

MSCHF's *Wavy Baby* drop is just hours away. MSCHF has been designing the Wavy Babies for nearly a year and has entered into several contracts to manufacture and promote the

---

[2]   It is permissible for the Court to consider evidence of settlement discussions when such evidence is offered to disprove a party's contention that it will suffer irreparable harm in the absence of a preliminary injunction. *OurBus*, 2019 WL 2710111, at *13; *see also BitTitan, Inc. v. SkyKick, Inc.*, No. 15-CV-0754, 2015 WL 5081130, at *8 (W.D. Wash. Aug. 27, 2015); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2011 WL 7036077, at *40 & n.39 (N.D. Cal. Dec. 2, 2011), *aff'd in part, vacated in part on other grounds, remanded*, 678 F.3d 1314 (Fed. Cir. 2012).

shoes, including one with well-known rapper Tyga. More importantly, MSCHF's First Amendment right to create art and comment on Vans and consumerism trumps Vans' interests in financial gain. Indeed, whereas any harm that Vans might face if the drop proceeds as planned is fully compensable, MSCHF would face irreparable harm if the TRO were granted. *See Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."); *Michel v. Bare*, 230 F. Supp. 2d 1147, 1159 (D. Nev. 2002) ("In First Amendment cases, irreparable harm is essentially presumed.") (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

An injunction would prevent MSCHF from selling the art it has already created, which would cause MSCHF economic hardship and would damage MSCHF's reputation with its business partners, who will likely be wary of conducting future business with MSCHF. *See Winterland Concessions Co. v. Loren*, 1990 U.S. Dist. LEXIS 21079, at *12–13 (S.D. Cal. Apr. 17, 1990) (balance of hardships favored defendants when injunction would (1) prevent defendants' sale of already-printed comic books; and (2) make distributors wary of doing business with defendants). An injunction would also impose a prior restraint on MSCHF's expression, which is why "the First Amendment strongly disfavors injunctions that impose a prior restraint on speech." *Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 178 (2d Cir. 2001).

Lastly, the hardship of an injunction on MSCHF, a relatively small Brooklyn-based art collective, would be far greater than any hardship of an absence of an injunction on Vans, a multi-billion-dollar footwear and apparel company. *See* Pl.'s Br. at 3, 5, 7; *Shred-It, USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 234 (S.D.N.Y. 2002) ("The harm to [defendant], who operates a new and relatively small business, if she is improperly enjoined . . . will be much

greater than the harm to [plaintiff], a large international business, if [defendant] is improperly allowed to continue operating.").

V.    **The Public Interest in Free Expression Weighs Against an Injunction.**

The court made clear in *Rogers* that "the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." 875 F.2d at 999. The interest in avoiding consumer confusion (which simply does not exist in this case) outweighs the public interest in free expression *only* where a defendant's use "has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [use] explicitly misleads as to the source or the content of the work." *Id.* As explained above, MSCHF's visual references to Vans' Old Skool sneakers are artistically relevant to the *Wavy Baby* project and the project is not explicitly misleading, so any interest in avoiding confusion is strongly outweighed the public's interest in free expression.

Among the members of the public who have an interest in free expression connected to this case are other artists whose expression would be chilled by an injunction against *Wavy Baby*. Additionally, an injunction would cast a cloud over artworks that already have incorporated *Wavy Baby* into the work, such as Tyga and Doja Cat's music video for "Freaky Deaky."

Furthermore, following the Supreme Court's reminder that "context is everything" in cases involving parody, *Campbell*, 510 U.S. at 589, even if there were some risk of consumer confusion, that confusion would be mitigated by the fact that MSCHF's drop is limited to only 4,000 pairs of *Wavy Baby* works, connected to its drop today. Accordingly, any risk of confusion is limited, further demonstrating that expressive interests are paramount in this case.

**CONCLUSION**

For the foregoing reasons, MSCHF respectfully requests that the Court deny Plaintiffs' application for a temporary restraining order.

25

Dated:  New York, New York        Respectfully submitted,
        April 18, 2022


                                  By: /s/ *David H. Bernstein*
                                        David H. Bernstein

                                  DEBEVOISE & PLIMPTON LLP
                                  David H. Bernstein
                                  Megan K. Bannigan
                                  Marissa MacAneney
                                  Timothy Cuffman
                                  919 Third Avenue
                                  New York, New York 10022
                                  Tel: (212) 909-6000
                                  Fax: (212) 909-6836
                                  dhbernstein@debevoise.com
                                  mkbannigan@debevoise.com
                                  mpmacaneney@debevoise.com
                                  tcuffman@debevoise.com

                                  SWANSON, MARTIN & BELL, LLP
                                  William D. Patterson (*pro hac vice* forthcoming)
                                  Nicole E. O'Toole (*pro hac vice* forthcoming)
                                  330 N. Wabash, Suite 3300
                                  Chicago, IL 60611
                                  (312) 321-8445
                                  wpatterson@smbtrials.com
                                  notoole@smbtrials.com

                                  MSCHF PRODUCT STUDIO, INC.
                                  John Belcaster (*pro hac vice* forthcoming)
                                  62 Bayard Street
                                  Brooklyn, NY 11222
                                  john@mschf.xyz

                                  *Counsel for Defendant MSCHF Product Studio,
                                  Inc.*