UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VANS, INC. and VF OUTDOOR, LLC,  :
:
        Plaintiffs,  :
:
        v.  :   **<u>DECISION & ORDER</u>**
:   22-CV-2156 (WFK) (RML)
MSCHF PRODUCT STUDIO, INC.,  :
:
        Defendant.  :
------------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge:**
Before the Court is a motion by Vans, Inc. and VF Outdoor, LLC (collectively, "Plaintiffs" or "Vans") seeking a temporary restraining order and preliminary injunction against MSCHF Product Studio, Inc. ("Defendant") related to its sale of the "Wavy Baby" shoes, which Plaintiffs assert, *inter alia*, infringe their trademarks and trade dress in violation of the Lanham Act. For the following reasons, the Court GRANTS Plaintiffs' motion for a temporary restraining order and a preliminary injunction.

## BACKGROUND

This action arises out of a collaboration between Defendant and Michael Stevenson, who uses the stage name "Tyga," to design, to develop, and to sell the "Wavy Baby" shoes. Plaintiffs assert those activities violate their intellectual property rights by incorporating Plaintiffs' trademarks and trade dress. *See* Compl. ¶ 7, ECF No. 1. The Defendant released four thousand three hundred and six (4,306) Wavy Baby shoes for sale on Monday, April 18, 2022, at 12:00 Noon. Rosendahl Decl. ¶ 11, ECF No. 27-3.

On April 14, 2022, Plaintiffs filed a Complaint against Defendant asserting six claims for: (1) Federal Trademark Infringement in violation of 15 U.S.C. § 1114; (2) Federal Unfair Competition and False Designation of Origin in violation of 15 U.S.C. § 1125(a); (3) Federal Trademark Dilution in violation of 15 U.S.C. § 1125(c); (4) Unfair Trade Practices in violation of New York General Business Law § 349; (5) Trademark Dilution in violation of New York General Business Law § 360-1; and (6) Common Law Trademark Infringement and Unfair

1

Competition. *See* Compl. Plaintiffs assert the Wavy Baby shoes and associated advertising infringe Plaintiffs' "jazz stripe" trademark (the "Side Stripe Mark"), "Flying-V" mark, "OFF THE WALL" mark, waffle sole mark, and Vans footbed logo (collectively, the "Marks") and the Plaintiffs' Old Skool shoes trade dress, Off the Wall trade dress, and shoe box trade dress (collectively, the "Trade Dress"). Pls. Mem. at 3, 14, ECF No. 12-1.

On April 15, 2022, Plaintiffs moved for a temporary restraining order ("TRO") and preliminary injunction to enjoin Defendant from: (1) releasing for sale to the public any of the Wavy Baby shoes or any colorful imitations or reconstructions thereof (collectively, the "Wavy Baby shoes"); (2) fulfilling orders for any of the Wavy Baby shoes; (3) using Vans' Old Skool Trade Dress or Side Stripe Mark, or any mark that is confusingly similar to Vans' marks and trade dress or that is a derivation or colorable imitation or recreation thereof, regardless of whether used alone or with other terms or elements; (4) referring to or using any of the Marks, Trade Dress, or derivations and colorable imitations or recreations thereof in any advertising, marketing, or promotion; and, (5) instructing, assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to above, or taking any action that contributes to any of the activities referred to above. Pls. Mot. at 4, ECF No. 12. Plaintiffs requested the Court to order Defendant to place in escrow any funds received from all orders taken to date for the Wavy Baby shoes so that, if Plaintiffs prevail in this action, Defendant is able to return those funds to customers who ordered the Wavy Baby shoes under the mistaken belief Vans was the source of the shoes or otherwise approved or sponsored the shoes. Finally, Plaintiffs sought permission to file with the Court within thirty (30) days after entry of the injunction a report in writing under oath detailing the manner and form in which Defendant has complied with the injunction. Pls. Mot. at 5.

In assessing Plaintiffs' motion for injunctive relief, this Court has reviewed the submissions of Plaintiffs and Defendant, including their memoranda, declarations, and exhibits, as well as the amicus curiae brief submitted by Harvard Law Professor Rebecca Tushnet. The Court also considered carefully the oral arguments made by counsel at the hearing held on April 27, 2022.

## DISCUSSION

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. ___ 138 S.Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008)). "To obtain a preliminary injunction, a plaintiff must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor.'" *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).

"The Second Circuit has not definitively ruled on whether a Court should consider the [balance of the hardships and the public interest as] set forth in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006), and *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008), in evaluating preliminary injunctions in the trademark infringement context." *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15-CV-1092, 2015 WL 845711, at *2 (S.D.N.Y. Feb. 26, 2015) (Furman, J). However, "'*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context,' and some district courts have applied the additional two factors in the trademark and trade dress

3

infringement context as well." *Id.* (quoting *Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010)). Accordingly, the Court also considers those factors here.

I.   **Likelihood of Success on the Merits or Serious Questions Going to the Merits**

"The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015). "In order to establish a valid Lanham Act claim based on trademark or trade dress infringement, a party must show, first, that the trademark or trade dress is valid and entitled to protection, and second, that defendant's use of the trademark or trade dress is likely to cause consumer confusion as to the origin, affiliation or association, or endorsement of defendant's goods or services." *Barefoot Contessa Pantry, LLC*, 2015 WL 845711, at *3 (citing *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings*, 696 F.3d 206, 216–17 & n.9 (2d Cir. 2012)).

"The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). However, "[b]ecause the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, . . . its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id.* (citing *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 815–19 (2d Cir. 1979); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)) (emphasis in original).

### A. Plaintiffs' Marks Merit Protection

Courts analyzing trademark infringement claims first "look to see whether plaintiff's mark merits protection. In order for a trademark to be protectable, the mark must be 'distinctive' and not 'generic.' A mark is said to be 'inherently' distinctive if '[its] intrinsic nature serves to identify a particular source." *Christian Louboutin S.A.*, 696 F.3d at 216 (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997)) (alteration in original). A mark inherently not distinctive may instead "'acquire' distinctiveness by developing 'secondary meaning'"—that is, "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). Federal registration of a trademark is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark." *Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017); 15 U.S.C. § 1057(b).

"Trade dress" is a "category that originally included only the packaging, or 'dressing' of a product, but . . . has been expanded . . . to encompass the design of a product." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000). A product's trade dress is protected "if it is not functional and if it is either inherently distinctive or has acquired secondary meaning in the marketplace." *Shandong Shino Food Indus. Co., Ltd. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 253 (E.D.N.Y. 2021) (Brodie, C.J.) (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001)). Secondary meaning may be shown by: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited

media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Christian Louboutin S.A.,* 696 F.3d at 226.

The Court finds Plaintiffs have established a likelihood of prevailing in their argument the Marks and the Trade Dress merit protection. Plaintiffs' Marks are registered, *see* Wimmer Decl. ¶¶ 9, 15, Exs. 1–4, 6–7, ECF No. 12-2, and therefore prima facie valid and protectable. *See Matal v. Tam*, 137 S. Ct. at 1753. Plaintiffs have also sufficiently demonstrated a likelihood of success in asserting their trade dress has acquired secondary meaning. In particular, Plaintiffs note consumer surveys have shown the Old Skool shoe trade dress is a unique source identifier for Vans, Pls. Mem. at 9; Wimmer Decl. ¶ 14, Ex. 5; the Marks have received unsolicited coverage in third-party publications and reports commenting on the design, Regan Decl. ¶¶ 18, 22–23, ECF No. 12-4; the Plaintiffs have sold over 200 million pairs of the Old Skool shoes since their introduction in 1977, Callahan Decl. ¶¶ 5–7; and the Plaintiffs have invested millions of dollars in advertising the Old Skool trade dress, Regan Decl ¶ 20. Overall, Plaintiffs have sufficiently demonstrated a likelihood of showing "in the minds of the public," the Old Skool trade dress operates as an identifier of the source of the product. *See Christian Louboutin S.A.*, 696 F.3d at 216. Furthermore, Defendant has offered no argument disputing the validity of the Marks.

### B. Consumer Confusion

If a plaintiff's trademark is valid and protectable, courts must then "determine 'whether [the] defendant's use of a similar mark is likely to cause consumer confusion.'" *Id.* at 217 (quoting *Dooney & Bourke, Inc.*, 454 F.3d at 115); *see also* 15 U.S.C. § 1114(1)(a)–(b). In order to determine the likelihood of confusion, courts in the Second Circuit apply the factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961): (1) the strength of

the trademark; (2) the degree of similarity between the two marks; (3) the proximity of the products and their competitiveness with one another; (4) the likelihood the prior owner may "bridge the gap" in the markets for the products; (5) evidence of actual consumer confusion; (6) the defendant's good faith in adopting its imitative mark; (7) the quality of defendant's product compared with the plaintiff's product; and (8) the sophistication of the buyers. *See id.* at 495.

"The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'" *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir.2009) (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005)). "No single *Polaroid* factor is determinative. Rather each must be considered in the context of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate conclusion, whether there is likelihood of confusion between the two parties' products." *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir. 1983) (citing cases).

Considering the *Polaroid* factors here, the Court finds Plaintiffs have demonstrated a likelihood of prevailing on the issue of consumer confusion. In particular, the Court notes the striking visual similarities between the Old Skool shoes and the Wavy Baby shoes and their respective packaging. Defendant asserts while the Wavy Baby shoes are reminiscent of the Old Skool shoes, each purported use of Plaintiffs' Marks is distorted and thus different from the Old Skool shoes. Def. Mem. at 14, ECF No. 13; Wiesner Decl. ¶¶ 61–66, ECF No. 17. However, the Marks need not be identical, but rather only similar, for there to be a likelihood of confusion. "Whether simultaneous viewing by consumers is likely to result in confusion is not relevant when it is serial viewing that is at issue given the market context or the type of confusion claimed. In such a case, a district court must ask not whether differences are easily discernable

7

on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing." *Burlington Coat Factory Warehouse Corp.*, 426 F.3d at 538. "The Lanham Act protects against several types of consumer confusion, including *point-of-sale* confusion, *initial interest* confusion, and *post-sale* confusion, and the *Polaroid* factors must be applied with an eye toward each of these." *Id.* at 537 n.2 (internal citations omitted) (emphasis in original). Here, Defendant's distortion of the original marks is insufficient to dispel consumer confusion.

Plaintiffs have sufficiently demonstrated actual consumer confusion. Multiple independent sources commented on the similarity between the Old Skool shoes and the Wavy Baby shoes. Consumers have misunderstood the source of the Wavy Baby shoes as a collaboration between Plaintiffs and Defendant. *See* Pls. Mem. at 22; Rosendahl Decl. ¶ 4; Pls. Reply Mem. at 1–2, ECF No. 27. In an episode of the "Complex Sneakers Podcast," entered into evidence during the April 27, 2022 hearing on this motion, and described as "the quintessential sneakerhead show," Tr. at 37, one of the show's hosts stated, in sum and substance, to Defendant's chief creative officer, Lukas Bentel,

> Everyone I've spoken to about this shoe says that if someone was walking down the street and . . . if I asked you to tell me what the person across the street was wearing, they'd say they're wearing a pair of Vans. . . . Just the fact that the average person wouldn't, unless you like, sat there and looked at it with, you know, a magnifying glass, and saw the label on the back and saw that it read this, but just like, if you walked across the office, if you were wearing a pair of those sneakers, it's a pair of Vans.

To which Mr. Bentel responded,

> Yes, these are the anchor of the shoe, like the base of the shoe before our transformation is of course a Vans, and I think there's no doubting that. And we are completely playing into that space, but there are a few things: number one I think it is a really unique transformation Vans would not ever have done. I wouldn't even say, like, I have a pair right now, and if you put them on and walked around,

8

you'll see this is not the greatest foot-feeling shoe. . . . This in our mind is an image, it's sort of like if you want to . . . like if we're talking about things that are untouchable to us, frequently you would think, you know, like, big brands. You walk out, you look at the street, you're seeing just advertising everywhere, and these are the things that are untouchable. They're like sacred in some sense, and in the same sense we're just completely inundated by it all the time. So I think one of the things we really play on and like, play with is just trying to push those boundaries of like, what we as people interacting in the world can touch and mess with. So this is a play in that space, and we've had many other plays in that space previously that really range from very fine art-related things to some of these.

Complex Sneakers Podcast at 31:40–34:10. The host of a show dedicated to the discussion of sneakers comments directly upon the actual confusion of the average consumer.

The Court finds the "sophistication of the buyers" factor weighs in Plaintiffs' favor. Defendants sold the Wavy Baby shoes to the general public through self-service mediums accessible without professional assistance, and shoes generally are a common consumer item. Pls. Mem. at 24; Wimmer Decl. ¶¶25–26. "Retail customers . . . are not expected to exercise the same degree of care as professional buyers, who are expected to have greater powers of discrimination." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (internal citations omitted). The Defendant engaged in a broad advertising campaign for the Wavy Baby shoes in conjunction with Tyga, an artist with a significant fan base. It is likely at least some buyers of the Wavy Baby shoes purchased them as a result of this public campaign, which included a video in which Tyga appeared to microwave an Old Skool shoe to produce a Wavy Baby shoe, Pls. Reply. at 6. Defendant argues few of the purchasers of the Wavy Baby shoes were likely to be unsophisticated members of the general public, as the shoe was only available for a short period of time on the Defendant's website and proprietary application. Def. Mem. at 16. This is merely supposition. Tr. at 8. Defendant has offered no persuasive rationale as to why the Wavy Baby shoe's sale solely on Defendant's website and application poses such a barrier to entry that only sophisticated consumers would have purchased the shoe.

Plaintiffs demonstrated sufficient proximity of the products in question. Both products are sneakers marketed with similar skate-related imagery. Plaintiffs regularly release special edition versions of the Old Skool shoes, including limited edition models developed in collaboration with artists, released in quantities similar to that of the Wavy Baby shoes, and at a closer price point of $180.00 as compared to the retail price of $220.00 for the Wavy Baby shoes. *See* Pls. Mem. at 22; Def. Mem. at 16; Tr. at 79. Defendant argues the Wavy Baby shoes are a "limited edition, collectible work of art," "likely to be kept in glass cases or on shelves," in contrast to the "simple and practical" Old Skool shoes, which are "meant to be worn." Def. Mem. at 17. However, in his interview on the Complex Sneakers Podcast, when comparing the Wavy Baby shoes with prior shoes developed by the Defendant, Mr. Bentel stated,

> For better or for worse, we were thinking of those [prior shoes] as art pieces. I know now this is sort of transcending into more of a straight sneaker space. And so that is us sort of pushing those buttons a little more in some sense because I think we were told that we couldn't do certain things, and we said we're just going to figure out how to make them ourselves. So that's sort of the impetus behind pushing, you know, an actual sneaker brand, MSCHF sneakers.

Complex Sneakers Podcast at 36:45–37:16. Defendant's founder and chief executive officer, Gabriel Whaley, additionally stated Defendant has retained approximately 280 pairs of the Wavy Baby shoes which it had intended to use to "account for any fulfillment errors and to fulfill requests from museums and galleries for exhibitions." Supp. Whaley Decl. ¶ 14, ECF No. 22. Defendant stated during the April 27, 2022 hearing that the fulfillment errors refer to incorrect sizes being shipped. Tr. at 57–58. However, Plaintiffs noted if the shoes were truly meant to be artworks to be displayed rather than worn, there would be no specific need for consumers to receive a particular size. Tr. at 84. Despite Defendant's assertions the Wavy Baby shoes belong in museums and galleries for exhibition, the production of 4,306 pairs of shoes places the Wavy Baby shoes on a mobile footing vastly different from one found at the Brooklyn Museum.

The variation in quality between the Wavy Baby shoes and the Plaintiffs' Old Skool shoe also weighs in favor of Plaintiffs. Plaintiffs highlight particular deficiencies in the Wavy Baby shoes not apparent in Old Skool shoes. The exhibits depict the red coloring of the heel patch showing through the Wavy Baby shoe's white background, and misalignment of the black stripe bordering the upper sidewall of the shoe, which could lead to consumer confusion regarding the quality expected from a Vans shoe. *See* Rosendahl Decl. ¶¶ 18-19. Both parties note the wavy construction of the shoes may create a risk of injury to wearers, a risk which Plaintiffs argue, and the Court agrees is likely to threaten Plaintiffs' reputation as a source of "high-quality, dependable footwear." Pls. Mem. at 23. Given the proximity of the products, the Court finds this factor weighs in favor of an injunction. On this record, the good faith of the Defendant is indeterminable; therefore this factor does not impact the assessment of the Court.

On balance, the *Polaroid* factors weigh in favor of Plaintiffs. The Court finds Plaintiffs have demonstrated the Wavy Baby shoes will likely cause consumer confusion. *See Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F. Supp. 1268, 1277 (S.D.N.Y. 1994) (Cedarbaum, J.) ("the fact that the majority of factors weigh [in favor of] an injunction is significant").

### C. First Amendment

Defendant's primary argument in opposition to Plaintiffs' motion for a temporary restraining order and preliminary injunction is that Plaintiffs are not likely to succeed on the merits of their trademark claims because the Wavy Baby shoes are a parodic or artistic expression of Plaintiffs' Marks and Trade Dress and thus protected by the First Amendment. Plaintiffs argue, and the Court agrees, that Plaintiffs are likely to succeed on the merits with respect to Defendant's First Amendment arguments.

11

While Courts have "accorded considerable leeway to parodists whose expressive works aim their parodic commentary at a trademark or a trademarked product, . . . [they] have not hesitated to prevent a manufacturer from using an alleged parody of a competitor's mark to sell a competing product." *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999) (limiting parodic use of a trademark where Defendant infringed the mark of a corporation which manufactures, sells, and offers repair services for motorcycles, in order to advertise his own motorcycle repair and parts business). "A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody." *Cliffs Notes, Inc.*, 164 F.3d at 494. "The latter message 'must not only differentiate the alleged parody from the original but must also communicate some articulable element of satire, ridicule, joking, or amusement.'" *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 434–35 (S.D.N.Y. 2016) (Furman, J.) (quoting *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir. 2007)), *aff'd*, 674 F. App'x 16 (2d Cir. 2016). A successful parody "clearly indicates to the ordinary observer 'that the defendant is not connected in any way with the owner of the target trademark.'" *Id.* at 435 (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:153 (4th ed.)). *See also Haute Diggity Dog, LLC*, 507 F.3d at 259 ("[I]t is this lack of confusion that a parodist depends upon to achieve the parody.").

Whatever the actual artistic merits of the Wavy Baby shoes, the shoes do not meet the requirements for a successful parody. Defendant argues the Wavy Baby shoes render "what could previously only be seen digitally into something physical" and "critique consumer culture and Vans' outsized role in that culture." Def. Mem. at 9; Whaley Decl. ¶ 40, ECF No. 18. While the Wavy Baby shoes convey their similarity and reference to the Old Skool shoe Marks,

the shoes do not sufficiently articulate an "element of satire, ridicule, joking or amusement" clearly indicating to the ordinary observer the Defendant is "not connected in any way with the owner of the target trademark." *My Other Bag, Inc.*, 156 F. Supp. 3d at 435. Although Defendant included its own branding on the label and distorted the original Marks, the extensive similarities and overall impression overcome any such distinguishing features, as evidenced by actual confusion in the marketplace. While the manifesto accompanying the shoes may contain protected parodic expression, the Wavy Baby shoes and packaging in and of themselves fail to convey the satirical message.

Defendant cites *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, noting the court held "defendant's use of [Louis Vuitton's famous] mark [on a tote bag called My Other Bag] is an obvious parody or pun, readily so perceived, and unlikely to cause confusion among consumers." Def. Mem. at 11 (quoting 156 F. Supp. 3d at 443). The instant case is distinguishable: the satirical message presented by the Wavy Baby shoes is not readily perceived from the product without the accompanying manifesto or descriptions. This contrasts with the play on the "well-known 'my other car . . .'" joke in *My Other Bag, Inc.*, 156 F. Supp. 3d at 435, which itself served to further distance the tote bag from a Louis Vuitton bag. *Id.* Defendant additionally offers as a comparison *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, wherein the Ninth Circuit concluded a rubber dog toy in the shape of a Jack Daniels whiskey bottle, featuring altered Jack Daniels trade dress, was expressive and shielded from trademark liability as a parody. 953 F.3d 1170, 1175–76 (9th Cir. 2020). However, the Court finds this comparison unpersuasive. Unlike in the case at bar, the dog toy does not occupy the same market as Jack Daniels whiskey, and where the infringement claim involves a competing product, "parodic use is sharply limited." *Harley Davidson, Inc.*, 164 F.3d at 813. Further, the dog toy incorporates clear puns and

13

parodic references and displays clear distinctions between the products, making the parody more discernable and overt. If Jack Daniels made milk bones the Holmesian Dog would have a different bark.

Plaintiffs have sufficiently shown they are entitled to a preliminary injunction on the basis of their trademark infringement claims. Therefore, Court need not address whether Plaintiffs are likely to prevail on the merits of their claims of trademark dilution.

## II. Irreparable Harm

"Irreparable harm is 'the single most important prerequisite' for relief." *Weaver v. Schiavo*, 750 Fed. App'x 59, 60 (2d Cir. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Oliver v. New York State Police*, 812 Fed. App'x 61, 62 (2d Cir. 2020) (summary order) (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249–50 (2d Cir. 1999)). The moving party must demonstrate "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (citation omitted). Where a plaintiff alleging a trademark violation establishes a likelihood of success on liability, irreparable harm is presumed. *See* 15 U.S.C. § 1116(a). Once a mark is found protectable, "a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citation omitted); *see also Burlington Coat Factory Warehouse Corp.*, 426 F.3d 537; *Marks Org., Inc. v. Joles*,

14

784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (Wood, J.) (even absent a presumption of irreparable injury, "a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury."). Courts have found irreparable harm "where the reputation and goodwill cultivated by the party seeking the injunction would be out of the party's control because of the infringement." *Microban Prods. Co. v. API Indus., Inc.,* No. 14–CV–41, 2014 WL 1856471, at *21 (S.D.N.Y. May 8, 2014) (Failla, J.).

Plaintiffs have spent forty-five years, and millions of dollars in advertisement and marketing, to develop the brand recognition and success the Old Skool shoes and associated Trade Dress enjoy today. Def. Mem. at 8; Regan Decl. ¶ 20. The Wavy Baby shoe developed by Defendant creates a strong risk of consumer confusion and irreparable harm to the consumer recognition and goodwill cultivated by Plaintiffs. Callahan Decl. ¶¶ 12-19.

Defendant's repeated assurances they will not develop, promote, or advertise allegedly infringing products "during the pendency of the litigation," failed to reassure the Court Plaintiffs will be secure from further harm absent injunctive relief. Tr. at 58, 60, 61, 62, 63. Defendant failed to make any representations it will not continue to produce iterations of the Wavy Baby shoes following the conclusion of the present litigation for one reason: it intends to do precisely that.

The Court therefore finds the Plaintiffs have sufficiently demonstrated a likelihood of irreparable harm.

### III.   Balance of the Hardships and Public Interest

The Court "balance[s] the equities" by "exploring the relative harms to applicant and respondent, as well as the interests of the public at large." *Hartford Courant Co., LLC v.*

15

*Carroll*, 986 F.3d 211, 224 (2d Cir. 2021) (alterations omitted) (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (Thomas, J., concurring)).

The balance of the equities weighs decidedly in Plaintiffs' favor. Consumer confusion and potential loss to Plaintiffs in terms of sales, reputation, and goodwill threatens to cause Plaintiffs continuing harm. *See U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 511 Fed. App'x 81, 85 (2d Cir. 2013) (summary order) (recognizing that "ceding . . . control over [] reputation and goodwill" may constitute irreparable harm); *New York City Triathalon, LLC v. NYC Triathalon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) (McMahon, J.) ("Prospective loss of [] goodwill alone is sufficient to support a finding of irreparable harm.") (citation omitted). Although Defendant argues Plaintiffs' losses are compensable with money damages, "remedies at law generally cannot adequately compensate a trademark plaintiff for its injuries" because "the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable[.]" *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Assoc., Inc.*, No. 10-CV-3314, 2015 U.S. Dist. LEXIS 84172, at *32 (S.D.N.Y. 2015) (Sweet, J.) (citing cases); *see NYP Holdings v. N.Y. Post Publ'g Inc.*, 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014) (Marrero, J.) (explaining "loss of control over one's reputation is neither calculable nor precisely compensable.") (citation omitted). Any harm to Defendant is significantly mitigated because Defendant agreed to cease selling the Wavy Baby shoes during the pendency of this action.

Moreover, while the public has an interest in free expression, "[t]he consuming public [also] has a protectable interest in being free from confusion, deception and mistake[.]" *NYP Holdings*, 63 F. Supp. 3d at 342 (citation omitted). The Plaintiffs have demonstrated the Defendant's sale and marketing of the Wavy Baby shoes causes a significant danger of consumer

16

confusion. Accordingly, the Court finds the public interest also weighs in favor of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' request for a temporary restraining order and preliminary injunction, at ECF No. 12, is GRANTED.

(1) During the pendency of this action, Defendant and its officers, agents, employees, attorneys, and all other persons who are in active concert or participation with Defendant are prohibited from fulfilling orders for the "Wavy Baby" shoes and/or colorable imitations or reconstructions thereof (the "Prohibited Shoes");

(2) during the pendency of this action, Defendant, and any companies owned or controlled by Defendant, and its/their officers, agents, representatives, privies, principals, directors, shareholders, managing agents, owners, licensees, distributors, servants, attorneys, employees, affiliates, subsidiaries, parents, successors, and assigns, and all other persons who are in active concert or participation with any of them are prohibited from advertising, marketing, promoting, offering to sell, selling, distributing and/or taking orders for the Prohibited Shoes;

(3) Defendant shall reverse and/or cancel any orders for the Prohibited Shoes that have been placed as of the time of this Order;

(4) for any order that cannot be reversed and/or cancelled, Defendant must escrow any funds received from all orders taken to date for the Prohibited Shoes so that, if Vans prevails in this action, Defendant may return those funds to customers who ordered

Defendant's Prohibited Shoes under the mistaken belief that Vans was the source of the shoes or otherwise approved or sponsored the shoes; and

(5) Defendant must file with the Court within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: April 29, 2022
Brooklyn, New York